## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | | |
|---|---|---|
| ANDREW PRESSON and KIMBERLY MYRIS, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | **Case No. 5:18-cv-466** |
| v. | ) ) | **CLASS AND COLLECTIVE ACTION COMPLAINT** |
| RECOVERY CONNECTIONS COMMUNITY, JOURNEY TO RECOVERY LLC, JENNIFER A. WARREN, PHILLIP J. WARREN, 3M & N, INC. d/b/a ZAXBY'S,WESTERN NORTH CAROLINA LIONS, INC. d/b/a MARJORIE MCCUNE MEMORIAL CENTER, INTEGRITY-HOMINY VALLEY, LLC d/b/a HOMINY VALLEY RETIREMENT CENTER, INTEGRITY-CANDLER 02 LLC d/b/a HOMINY VALLEY RETIREMENT CENTER, INTEGRITY-CANDLER LIVING CENTER, LLC d/b/a CANDLER LIVING CENTER, INTEGRITY-CANDLER 01 LLC d/b/a CANDLER LIVING CENTER, INTEGRITY SENIOR PROPERTIES INVESTMENTS, LLC, CEDARBROOK RESIDENTIAL CENTER, INC., and THE AUTUMN GROUP, INC. d/b/a OAK HILL LIVING CENTER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) ) | |

Plaintiffs, Andrew Presson and Kimberly Myris ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel of record, allege, upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

1.      For years, Defendants have escaped public oversight and accountability in profiting from unpaid labor performed by individuals struggling to overcome substance abuse and addiction.  While operating under the guise of a residential substance abuse recovery provider, Defendant Recovery Connections Community ("Recovery Connections") requires its program residents to work long hours—up to 16 hours per day—for area businesses, and then pockets the residents' wages for its own benefit.  The businesses that contract with Recovery Connections benefit from this scheme by receiving access to a pool of sub-market rate labor performed by Recovery Connections residents.  These businesses pay Recovery Connections a negotiated rate for the labor pool's work, knowing that the Recovery Connections residents receive no compensation for their labor.  Recovery Connection's deceptive marketing of itself as a substance abuse recovery service provider, and Defendants' practices of profiting off the unpaid labor of individuals seeking substance abuse rehabilitation are unlawful and violate public policy.

2.      Defendant Recovery Connections holds itself out as a live-in rehabilitation provider for persons with substance use disorders and addictions.

3.      Recovery Connections recruits rehabilitation program residents from other substance abuse rehabilitation providers and seeks referrals of individuals with substance abuse problems facing criminal charges through judicial and probation personnel.

4.      Recovery Connections informs prospective program residents that it provides substance abuse education, substance addiction assessments by certified professionals, life skills

and vocational training, "community support groups and resources," "animal and equine therapy," and aftercare.[1]

5.     Recovery Connections claims that its program offerings foster "healthy relationships," "productive habits," and a "foundation of life skills."[2]

6.     In spite of these promises, Recovery Connections fails to provide therapeutic treatment, training, and support to its residents.  Instead, Recovery Connections requires residents to perform arduous labor for long hours without pay.  Recovery Connections claims that this practice benefits residents and trains them in "vocational skills," but Recovery Connections provides no *bona fide* training, and the manual labor that residents are required to perform has no therapeutic value.

7.     Residents are required to work for various entities and individuals associated with Recovery Connections and numerous third-party businesses that contract with Recovery Connections for residents' labor, including local restaurants and adult care homes.

8.     The entities and individuals that have been associated with Recovery Connections include Journey to Recovery LLC, Jennifer Warren, and Phillip Warren (collectively, "RCC Defendants").

9.     The third-party businesses that have contracted with Recovery Connections for its residents' labor include local restaurants and adult care homes: 3M & N, Inc. d/b/a Zaxby's, Western North Carolina Lions, Inc. d/b/a Marjorie McCune Memorial Center, Integrity-Hominy Valley, LLC d/b/a Hominy Valley Retirement Center, Integrity-Candler 02 LLC d/b/a Hominy

---

[1]     *Mission*, Recovery Connections Community, http://www.recoveryconnectionscommunity.com (last visited Aug. 2, 2018); *About*, Recovery Connections Community, https://www.recoveryconnectionscommunity.com/about (last visited Aug. 2, 2018).

[2]     *Mission*, *supra* note 1.

Valley Retirement Center, Integrity-Candler Living Center, LLC d/b/a Candler Living Center, Integrity-Candler 01 LLC d/b/a Candler Living Center, Integrity Senior Properties Investments, LLC, Cedarbrook Residential Center, Inc., and The Autumn Group, Inc. d/b/a Oak Hill Living Center (collectively, "Contracting Companies," and together with "RCC Defendants," "Defendants").

10. By requiring Plaintiffs and other similarly situated residents to work excessive hours each week performing non-therapeutic labor for Defendants' benefit, the RCC Defendants and Contracting Companies together operated as "employers" or "joint employers" of Plaintiffs and similarly situated residents within the meaning of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, and the North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.1, *et seq.*, and 13 N.C. Admin. Code 12.0100, *et seq.* ("NCWHA"). Plaintiffs and similarly situated residents worked as "employees" of the RCC Defendants and Contracting Companies under the FLSA and NCWHA.

11. Accordingly, Plaintiffs bring this action against all Defendants on behalf of themselves and similarly situated current and former residents of Recovery Connections who elect to opt-in to this action pursuant to the FLSA's collective action provision, 29 U.S.C. § 216(b), for unpaid minimum wages and overtime.

12. Plaintiffs also bring this action against all Defendants on behalf of themselves and similarly situated current and former residents of Recovery Connections pursuant to Federal Rule of Civil Procedure 23, to remedy, in the alternative, violations for unpaid minimum wages and unpaid overtime; to remedy wage payment violations pursuant to the NCWHA; and to remedy Defendants' unjust enrichment at the expense of Plaintiffs and other residents.

4

13.     Plaintiffs also bring this action against the RCC Defendants on behalf of themselves and similarly situated current and former residents of Recovery Connections pursuant to Federal Rule of Civil Procedure 23, to remedy the RCC Defendants' unfair and deceptive practices that injured residents, pursuant to the Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.* ("UDTPA"); and the RCC Defendants' conversion of wages received on residents' behalf.

## THE PARTIES

### Plaintiffs

#### Andrew Presson

14.     Plaintiff Andrew Presson ("Presson") is an adult individual who resides in Olney, Maryland.

15.     In or around March 2018, Presson reviewed Recovery Connections's promotional material on its website and contacted Recovery Connections to inquire about enrolling in the program.

16.     Presson completed an application and Recovery Connections staff members interviewed Presson twice over the phone.

17.     Presson agreed to participate in the Recovery Connections program for the standard enrollment period of two years.

18.     Recovery Connections required Presson to pay a $150 entrance fee to enroll in the Recovery Connections program.

19.     Presson resided at "The Farm" Recovery Connections home located in Angier, North Carolina from approximately April 4, 2018 until approximately April 12, 2018.

5

20.     The RCC Defendants provided unsafe, unsanitary, and inadequate housing for Presson in the trailer where he and other residents lived on "The Farm."

21.     For example, the heating and air conditioning systems were defective; the trailer did not always have running water; the running water had an odor akin to sewage; unrepaired holes in the floors allowed unwelcome insects to enter the trailer and created a constant nuisance and risk of injury for residents; and broken furniture provided by "The Farm" was left unrepaired.

22.     Presson resided at the "Mountain Way" Recovery Connections home located in Asheville, North Carolina from approximately April 12, 2018 until approximately August 4, 2018.

23.     The RCC Defendants required Presson to assign his food stamps over to the RCC Defendants for the RCC Defendants' primary benefit, while depriving Presson of adequate food and nutrition.

24.     The RCC Defendants subjected Presson to psychologically harmful group sessions, which they claimed to be therapy.  During these mandatory group sessions, Jennifer A. Warren and Phillip J. Warren degraded Presson by verbally abusing him in front of his fellow residents and required his co-residents to surround him in a circle and scream insults at him.

25.     Throughout his time as a Recovery Connections program resident, the RCC Defendants required Presson to work many hours each week for Defendants without pay.

26.     The RCC Defendants did not permit Presson to work for employers other than Defendants while he was enrolled in the Recovery Connections program.

27.     To the best of his recollection, from approximately April 2018 to approximately May 2018, Presson worked for the RCC Defendants and Western North Carolina Lions, Inc. d/b/a Marjorie McCune Memorial Center.

28.     To the best of his recollection, from on or about May 2018 to August 2018, Presson worked for the RCC Defendants; Integrity Senior Properties Investments, LLC; Integrity-Hominy Valley, LLC d/b/a Hominy Valley Retirement Center; and Integrity-Candler 02 LLC d/b/a Hominy Valley Retirement Center.

29.     To the best of his recollection, from on or about May 2018 to August 2018, Presson worked for the RCC Defendants; Integrity Senior Properties Investments, LLC; Integrity-Candler Living Center, LLC d/b/a Candler Living Center; and Integrity-Candler 01 LLC d/b/a Candler Living Center.

30.     To the best of his recollection, from on or about July 2018 to August 2018, Presson worked for the RCC Defendants and Cedarbrook Residential Center, Inc.

31.     As a Recovery Connections resident, Presson regularly worked more than 40 hours per week for Defendants, with an average of 80 to 90 hours per week.

32.     Pursuant to Defendants' policy and pattern or practice, Defendants did not pay Presson the minimum wage for all hours worked or an overtime premium for hours worked in excess of 40 per workweek.  Presson never received any wages for his work for Defendants, with the exception of two checks he received directly from two of the employers for whom he worked in the final pay period.

33.     Presson is a covered employee within the meaning of the FLSA and the NCWHA.

34.     Presson's written Consent to Join form, pursuant to the FLSA, 29 U.S.C. § 216(b), is attached hereto as **Exhibit A**.

7

35.     Presson did not voluntarily bestow the benefit of his labor upon Defendants without expectation of compensation.

36.     Presson was substantially injured by working for Defendants' primary benefit without pay.

37.     Presson did not authorize Recovery Connections to assume and exercise the right of ownership over the wages that were owed to him for his labor.

**Kimberly Myris**

38.     Plaintiff Kimberly Myris ("Myris") is an adult individual who resides in Pinehurst, North Carolina.

39.     In or around May 2017, Myris learned of the Recovery Connections program through a social worker.

40.     Myris completed an application and Recovery Connections staff members interviewed Myris twice over the phone.

41.     Myris agreed to participate in the Recovery Connections program for the standard enrollment period of two years.

42.     Recovery Connections required Myris to pay a $150 entrance fee to enroll in the Recovery Connections program.

43.     Myris resided at "The Farm," Recovery Connections home located in Angier, North Carolina from approximately May 23, 2017 until approximately July 2, 2017.

44.     The RCC Defendants provided unsafe, unsanitary, and inadequate housing for Myris in the trailer where she and other residents lived on "The Farm."

45.     For example, unrepaired holes in the floors allowed unwelcome feral cats to enter the trailer and urinate on Myris's bed.

46. Myris resided at the "Flat Top" Recovery Connections home located in Fairview, North Carolina from approximately July 2, 2017 until approximately March 2018.

47. Myris resided at the "Jessica Holly House" Recovery Connections home located in Black Mountain, North Carolina from approximately March 2018 until approximately September 8, 2018.

48. The RCC Defendants provided unsafe and inadequate housing for Myris in the trailer where she and other residents lived at the "Jessica Holly House."

49. For example, the house was overcrowded, with twelve women living in a space that was approximately 936 square feet.

50. The RCC Defendants required Myris to assign her food stamps over to the RCC Defendants for the RCC Defendants' primary benefit.

51. The RCC Defendants subjected Myris to psychologically harmful group sessions, which they claimed to be therapy. During these mandatory group sessions, Jennifer A. Warren degraded Myris by verbally abusing her in front of her fellow residents and required her co-residents to surround her in a circle and scream insults at her.

52. Throughout her time as a Recovery Connections program resident, the RCC Defendants required Myris to work many hours each week for Defendants without pay.

53. The RCC Defendants did not permit Myris to work for employers other than Defendants while she was enrolled in the Recovery Connections program.

54. To the best of her recollection, from approximately May 2017 to approximately July 2017, Myris worked for the RCC Defendants and 3M & N, Inc. d/b/a Zaxby's.

55. To the best of her recollection, from on or about May 2017 to July 2017, Myris worked for the RCC Defendants and The Autumn Group, Inc d/b/a Oak Hill Living Center.

9

56.     To the best of her recollection, from on or about July 2017 to September 2018, Myris worked for the RCC Defendants; Integrity Senior Properties Investments, LLC; Integrity-Hominy Valley, LLC d/b/a Hominy Valley Retirement Center; and Integrity-Candler 02 LLC d/b/a Hominy Valley Retirement Center.

57.     To the best of her recollection, from on or about July 2017 to September 2018, Myris worked for the RCC Defendants; Integrity Senior Properties Investments, LLC; Integrity-Candler Living Center, LLC d/b/a Candler Living Center; and Integrity-Candler 01 LLC d/b/a Candler Living Center.

58.     To the best of her recollection, from approximately July 2017 to approximately May 2018, Myris worked for the RCC Defendants and Western North Carolina Lions, Inc. d/b/a Marjorie McCune Memorial Center.

59.     To the best of her recollection, from on or about May 2018 to August 2018, Myris worked for the RCC Defendants and Cedarbrook Residential Center, Inc.

60.     As a Recovery Connections resident, Myris regularly worked more than 40 hours per week for Defendants, with an average of 119 hours per week.

61.     Pursuant to Defendants' policy and pattern or practice, Defendants did not pay Myris the minimum wage for all hours worked or an overtime premium for hours worked in excess of 40 per workweek.  Myris never received any wages for her work for Defendants, with the exception of two checks she received directly from two of the employers for whom she worked in the final pay period.

62.     Myris is a covered employee within the meaning of the FLSA and the NCWHA.

63.     Myris's written Consent to Join form, pursuant to the FLSA, 29 U.S.C. § 216(b), is attached hereto as **Exhibit B**.

64.   Myris did not voluntarily bestow the benefit of her labor upon Defendants without expectation of compensation.

65.   Myris was substantially injured by working for Defendants' primary benefit without pay.

66.   Myris did not authorize Recovery Connections to assume and exercise the right of ownership over the wages that were owed to her for her labor.

**Defendants**

**Recovery Connections Community**

67.   Defendant Recovery Connections Community was registered as a non-profit corporation, from August 15, 2011 to May 15, 2018, with its principal place of business located at 65 Chestnut Hill Road, Black Mountain, North Carolina, 28711.

68.   Upon information and belief, Recovery Connections is no longer registered as a non-profit corporation.

69.   Upon information and belief, Recovery Connections engages and has engaged in commercial activities that compete with the activities of other commercial enterprises and risk driving down wages in the industries in which it operates.

70.   Upon information and belief, Recovery Connections and co-Defendant Journey to Recovery LLC operate under the common control of Jennifer A. Warren and Phillip J. Warren.

71.   Recovery Connections operates or operated five substance abuse rehabilitation homes, including:

      a.   Mountain Way, located at 15 East Mountain Way, Asheville, North Carolina, 28805;

b.      The Farm, located at 3110F Country Line Road, Angier, North Carolina, 27501;

c.      Phillip Michael House, located at 1384 Old Fort Road, Fairview, North Carolina, 28730;

d.      Flat Top, located at 29 Flat Top Mountain Road, Fairview, North Carolina, 28730; and

e.      Jessica Holly House, located at 2940 United States Highway 70, Black Mountain, North Carolina, 28711.

72.     Upon information and belief, Recovery Connections is not licensed to operate substance abuse rehabilitation programming or any other form of social services under any federal, state, or municipal law.

73.     By claiming to provide substance abuse recovery services, Recovery Connections holds itself out as an institution primarily engaged in the treatment and care of individuals struggling to overcome the physical, emotional, and mental health issues associated with addiction, who reside on its premises.

74.     Recovery Connections owns and operates Community Café, a business located at 121 East H Street, Suite 100, Erwin, North Carolina, 28339.

75.     Community Café is a restaurant staffed by Recovery Connections residents.

76.     Recovery Connections employed Plaintiffs and all those similarly situated within the meaning of the FLSA and the NCWHA.

77.     At all times relevant to this lawsuit, Recovery Connections has had substantial control over the working conditions of Plaintiffs and similarly situated residents of its program, and over the unlawful policies and practices alleged herein.

78.     Recovery Connections is a covered employer within the meaning of the FLSA and the NCWHA.

79.     Upon information and belief, Recovery Connections's annual gross volume of sales made or business done is not less than $500,000.

80.     Upon information and belief, the annual gross volume of sales made or business done by Recovery Connections and the other Defendants combined is not less than $500,000.

81.     At all times relevant to this lawsuit, Recovery Connections has failed to post notice or otherwise notify Plaintiffs and similarly situated residents of their rights as employees under the FLSA and NCWHA.

82.     Upon information and belief, Recovery Connections generated the vast majority of its annual gross volume of sales made or business done by contracting with other Defendants to sell the labor of Plaintiffs and similarly situated residents of Recovery Connections.

83.     Recovery Connections did not pay Plaintiffs or other similarly situated residents any wages for their labor, which was for the primary benefit of Recovery Connections and all other Defendants.

84.     Recovery Connections knew that it received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and other residents for this benefit.

85.     Recovery Connections engaged in deceptive acts by advertising and holding itself out to the public as a substance abuse recovery support service provider when, in fact, its primary function was to carry on a for-profit business by staffing adult care homes and other enterprises with labor performed by Plaintiffs and similarly situated residents of Recovery Connections in exchange for a fee.

13

86.     Upon information and belief, Recovery Connections is not licensed as a 24-hour residential program with North Carolina's Department of Health and Human Services, Division of Health Service Regulation, Mental Health Licensure and Certification Section as required by 10A of the N.C. Admin. Code 27(f)(.0100), *et seq*. ("Specific Rules for 24-Hour Facilities").

87.     Recovery Connections provides no *bona fide* counseling or treatment services, professional or otherwise.

88.     Recovery Connections required residents to pay a $150 entrance fee to enroll in Recovery Connections's program.

89.     Recovery Connections accepted, retained, and converted compensation owed to Plaintiffs and other similarly situated residents of Recovery Connections under the FLSA and the NCWHA for the labor they performed for the Contracting Companies.

**Journey to Recovery LLC**

90.     Defendant Journey to Recovery LLC ("Journey to Recovery") is a limited liability corporation with its principal place of business located at 65 Chestnut Hill Road, Black Mountain, North Carolina, 28711, which it shares with Recovery Connections.

91.     Journey to Recovery holds itself out as a substance abuse counseling provider.

92.     Defendant Phillip J. Warren is the President and Chief Executive Officer of Journey to Recovery.

93.     Upon information and belief, Journey to Recovery and co-Defendant Recovery Connections operate under the common control of Jennifer A. Warren and Phillip J. Warren.

94.     Upon information and belief, Journey to Recovery operates in concert with Recovery Connections to jointly employ Plaintiffs and similarly situated Recovery Connections residents within the meaning of the FLSA and the NCWHA.

95. Upon information and belief, at all times relevant to this lawsuit, Journey to Recovery has had substantial control over the working conditions of Plaintiffs and similarly situated Recovery Connections residents, and over the unlawful policies and practices alleged herein.

96. Upon information and belief, Journey to Recovery is a covered employer within the meaning of the FLSA and the NCWHA.

97. Upon information and belief, Journey to Recovery's annual gross volume of sales made or business done is not less than $500,000.

98. Upon information and belief, the annual gross volume of sales made or business done by Journey to Recovery and the other Defendants combined is not less than $500,000.

99. At all times relevant to this lawsuit, Journey to Recovery has failed to post notice or otherwise notify Plaintiffs and similarly situated residents of their rights as employees under the FLSA and NCWHA.

100. Journey to Recovery did not pay Plaintiffs and other Recovery Connections residents any wages for their labor, which was for the primary benefit of Journey to Recovery and all other Defendants.

101. Journey to Recovery knew that it received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and the other residents for this benefit.

**Jennifer A. Warren**

102. Defendant Jennifer A. Warren (formerly known as Jennifer Hollowell, Jennifer Welker, Jennifer Stewart, and Jennifer Welker Stewart) ("Jennifer Warren"), is an adult individual who resides at 65 Chestnut Hill Road, Black Mountain, North Carolina, 28711.

103.     Jennifer Warren is the founder, President, and Chief Operating Officer of Recovery Connections.

104.     Jennifer Warren has operational control over Recovery Connections and is deeply involved in its operations.

105.     The North Carolina Substance Abuse Professional Practice Board ("NCSAPPB") certified Jennifer Warren as a Certified Substance Abuse Counselor (CSAC) on or around May 19, 2000 and as a Certified Clinical Supervisor (CSC) on or around September 10, 2005.

106.     However, because of a disciplinary action for unethical conduct, the NCSAPPB revoked her CSAC and CSC license on or around May 1, 2012, and she has not had a CSAC or CSC license since then.

107.     The Notice of Hearing for the disciplinary actions resulting in revocation of Jennifer Warren's CSAC and CSC licenses alleged that Jennifer Warren "often used the [residents' food stamps] card(s) for herself and her family" resulting in "little food at the clients' residences."[3]

108.     The Notice of Hearing also alleges that Jennifer Warren used charitable donations and other assets intended for her clients for her own personal use and that she used client labor for her own personal services, among other infractions.[4]

109.     Upon information and belief, in or around 2015, Jennifer Warren pled guilty to financial assistance fraud for illegally collecting thousands of dollars' worth of food stamps.

---

[3]     Notice of Hearing at 7 -8, *N.C. Substance Abuse Prof. Prac. Bd. v. Hollowell*, EC Nos. 132-10 (NCSAPPB Sept. 22, 2012).
[4]     *Id.* at 4-14.

110. Upon information and belief, Jennifer Warren misappropriated Plaintiffs' and other residents' food stamps and items donated to Recovery Connections for residents' benefit, including clothes, vacations, and concert tickets, for her own personal use.

111. In addition to her role as owner and operator of Recovery Connections, Defendant Jennifer Warren required Plaintiffs and other residents to work for her in her personal capacity at her personal home and for her personal needs.

112. For example, Jennifer Warren has required Recovery Connections residents to clean her house, feed and water her animals, clean the quarters of her animals' living spaces, care for her children, and run her errands.

113. Jennifer Warren also required Plaintiffs and other residents to work for all other Defendants.

114. Upon information and belief, Jennifer Warren misappropriated Recovery Connections monies, including compensation received in consideration for residents' labor, for her own personal use.

115. Upon information and belief, Jennifer Warren, together with Phillip J. Warren, used the compensation received in consideration for Recovery Connections residents' labor to fund elaborate vacations to Greece, France, French Polynesia, Puerto Rico, and New Orleans, Louisiana.

116. Upon information and belief, Jennifer Warren has used the compensation received in consideration for Recovery Connections residents' labor to purchase exotic pets such as llamas, foxes, miniature ponies, and exotic birds for her personal collection.

117. Jennifer Warren is and has been an individual acting directly or indirectly in the interests of Defendants for purposes of 29 U.S.C. § 203(d).

118.     Jennifer Warren jointly and severally employed Plaintiffs and other residents together with Recovery Connections and all other Defendants.

119.     Jennifer Warren has maintained control and oversight over Plaintiffs and similarly situated residents' work, including scheduling, timekeeping, record-keeping, discipline, determining where they would work, and other employment practices that applied to them.

120.     Jennifer Warren did not pay Plaintiffs and other Recovery Connections residents any wages for their labor, which was for the primary benefit of Jennifer Warren and all other Defendants.

121.     Jennifer Warren knew that she received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and the other residents for this benefit.

**Phillip J. Warren**

122.     Defendant Phillip J. Warren ("Phillip Warren") is an adult individual who resides at 65 Chestnut Hill Road, Black Mountain, North Carolina, 28711.

123.     Phillip Warren is the Treasurer, Secretary, and Operations Manager of Recovery Connections.

124.     Phillip Warren is deeply involved in the operations of Recovery Connections.

125.     In addition to his role as the Operations Manager of Recovery Connections, Phillip Warren required Plaintiffs and other residents to work for him in his personal capacity at his personal home and for his personal needs.

126.     For example, Phillip Warren required Recovery Connections residents to build a deck at his home.

127.     Phillip Warren required Plaintiffs and other residents to work for all other Defendants.

128.     Upon information and belief, Phillip Warren misappropriated Recovery Connections monies, including compensation received in consideration for residents' labor, for his own personal use.

129.     Upon information and belief, Phillip Warren, together with Jennifer Warren used the compensation received in consideration for Recovery Connections residents' labor to fund elaborate vacations to Greece, France, French Polynesia, Puerto Rico, and New Orleans, Louisiana.

130.     Phillip Warren is and has been an individual acting directly or indirectly in the interests of Defendants for purposes of 29 U.S.C. § 203(d).

131.     Phillip Warren jointly and severally employed Plaintiffs and other residents together with Recovery Connections and all other Defendants.

132.     Phillip Warren maintained control and oversight over Plaintiffs and similarly situated residents, including scheduling, timekeeping, discipline, determining where they would work, and other employment practices that applied to them.

133.     Phillip Warren did not pay Plaintiffs and other Recovery Connections residents any wages for their labor, which was for the primary benefit of Phillip Warren and all other Defendants.

134.     Phillip Warren knew that he received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and the other residents for this benefit.

**3M & N, Inc. d/b/a Zaxby's**

135.   Defendant 3M & N, Inc. d/b/a Zaxby's ("Zaxby's"), is a North Carolina corporation with its principal place of business located at 309 Saint Matthews Road, Erwin, North Carolina, 28339.

136.   Zaxby's is a franchisee that owns and operates Zaxby's-branded restaurants located at:

a.   501 East Jackson Boulevard, Erwin, North Carolina, 28339;

b.   1665 North Main Street, Lillington, North Carolina, 27546; and

c.   80 Brandywood Court, Cameron, North Carolina, 28326.

137.   Pursuant to its contract with the RCC Defendants, Zaxby's employed Myris and similarly situated Recovery Connections residents within the meaning of the FLSA and the NCWHA.

138.   For example, Myris and other residents prepared and cooked food, washed dishes, and worked the cash register at Zaxby's restaurants.

139.   At all times relevant to this lawsuit, Zaxby's had substantial control over the working conditions of Myris and similarly situated Recovery Connections Residents, and over the unlawful policies and practices alleged herein.

140.   Upon information and belief, Zaxby's determined which residents could work for it.

141.   Upon information and belief, Zaxby's asked Recovery Connections for staffing for certain shifts, and Recovery Connections assigned particular residents to work those shifts.

142.   Upon information and belief, Zaxby's requested staffing from Recovery Connections knowing that Myris and similarly situated Recovery Connections residents were

20

also working shifts at other Contracting Companies as members of Recovery Connections's labor pool during the same workweek(s).

143.    Zaxby's managers and other personnel trained, supervised, and directed the work of Myris and similarly situated Recovery Connections residents while they were assigned to work at Zaxby's job sites.

144.    Zaxby's directed Myris and similarly situated Recovery Connections residents to cook food, prepare vegetables for salads and as condiments, work the cash register, and wash dishes.

145.    Zaxby's required Myris and similarly situated Recovery Connections residents to wear uniforms provided by Zaxby's, which conformed with Zaxby's standards.

146.    Zaxby's provided Myris and similarly situated Recovery Connections residents with the facilities, equipment, tools, uniforms, and other materials necessary to complete the work they performed.

147.    Zaxby's tracked the collective hours worked by Myris and similarly situated Recovery Connections residents as a "crew" while they were assigned to work at Zaxby's job sites.

148.    Upon information and belief, Zaxby's paid the RCC Defendants for the aggregate labor performed by Myris and other Recovery Connections residents at regular intervals using a pre-negotiated sub-market rate, knowing that such payments would not be passed on to the individuals who performed the labor.

149.    Zaxby's and the RCC Defendants co-determined the discipline of Myris and similarly situated Recovery Connections residents.  Upon information and belief, Zaxby's reported performance issues to the RCC Defendants, who then would issue discipline or

negotiate with Zaxby's regarding discipline or the continued employment of the employee in question.

150.    Zaxby's had the authority to terminate Myris and similarly situated Recovery Connections residents from further employment with Zaxby's.

151.    Upon information and belief, Zaxby's and the RCC Defendants had an agreement that Zaxby's would not hire (or re-hire) former Recovery Connections residents, regardless of whether they had worked at Zaxby's during their time at Recovery Connections.

152.    Zaxby's is a covered employer within the meaning of the FLSA and the NCWHA.

153.    Zaxby's jointly and severally employed Myris and other residents together with Recovery Connections and all other Defendants.

154.    Upon information and belief, Zaxby's annual gross volume of sales made or business done is not less than $500,000.

155.    Upon information and belief, the annual gross volume of sales made or business done by Zaxby's and the other Defendants combined is not less than $500,000.

156.    Zaxby's did not pay Myris and other Recovery Connections residents for their labor, which was for the primary benefit of Zaxby's and all other Defendants, including the minimum wage for all hours worked or an overtime premium for hours worked in excess of 40 per workweek.

157.    Zaxby's knew that it received a benefit from the labor of Myris and similarly situated residents of Recovery Connections and should reasonably have expected to pay Myris and other residents for the full value of this benefit.

**Western North Carolina Lions, Inc. d/b/a Marjorie McCune Memorial Center**

158.     Western North Carolina Lions, Inc. d/b/a Marjorie McCune Center ("McCune"), is a North Carolina corporation with its principal place of business located at 101 Lions Way, Black Mountain, North Carolina, 28711.

159.     McCune operates an adult care home called the Marjorie McCune Memorial Center, located at 101 Lions Way, Black Mountain, North Carolina, 28711.

160.     McCune primarily engages in the care of the sick, the aged, or the mentally ill or disabled who reside on the premises of its locations.

161.     Pursuant to its contract with the RCC Defendants, McCune employed Plaintiffs and similarly situated Recovery Connections residents within the meaning of the FLSA and the NCWHA.

162.     For example, Plaintiffs and other residents cleaned McCune's facilities, washed laundry, bathed and fed McCune's residents, changed its residents' clothing and diapers, walked the halls to ensure that residents remained in bed, and administered medication to residents.

163.     At all times relevant to this lawsuit, McCune had substantial control over the working conditions of Plaintiffs and similarly situated Recovery Connections residents while they were working at McCune, and over the unlawful policies and practices alleged herein.

164.     Upon information and belief, McCune determined which residents could work for it.  For example, upon information and belief, McCune did not allow Recovery Connections residents with felony criminal records to work for it.

165.     Upon information and belief, McCune asked Recovery Connections for staffing for certain shifts, and Recovery Connections assigned particular residents to work those shifts.

166. Upon information and belief, McCune requested staffing from the labor pool of Recovery Connections residents knowing that residents were also working shifts at other Contracting Companies during the same workweek(s).

167. McCune managers and other personnel trained, supervised, and directed the work of Plaintiffs and similarly situated Recovery Connections residents while they were assigned to work at McCune's facilities.

168. McCune directed Plaintiffs and similarly situated Recovery Connections residents to clean its facilities, wash laundry, bathe and feed its residents, change its residents' clothing and diapers, supervise its residents, and administer medication to its residents.

169. McCune required Plaintiffs and similarly situated Recovery Connections residents to wear uniforms that conformed with McCune's standards.

170. McCune provided Plaintiffs and similarly situated Recovery Connections residents with the facilities, equipment, tools, and other materials necessary to complete the work they performed.

171. McCune tracked the collective hours worked by Plaintiffs and similarly situated Recovery Connections residents as a "crew" while they were assigned to work at McCune's job site.

172. Upon information and belief, McCune paid the RCC Defendants for the aggregate labor performed by Plaintiffs and other Recovery Connections residents at regular intervals using a pre-negotiated sub-market rate, knowing that such payments would not be passed on to the individuals who performed the labor.

173. McCune and the RCC Defendants co-determined the discipline of Plaintiffs and similarly situated Recovery Connections residents. Upon information and belief, McCune

reported disciplinary issues to the RCC Defendants, who then would issue discipline or negotiate with McCune regarding discipline or the continued employment of the employee in question.

174.    McCune had the authority to terminate Plaintiffs and similarly situated Recovery Connections residents from further employment with McCune.

175.    Upon information and belief, McCune and the RCC Defendants had an agreement that McCune would not hire (or re-hire) former Recovery Connections residents, regardless of whether they had worked at McCune during their time at Recovery Connections.

176.    McCune is a covered employer within the meaning of the FLSA and the NCWHA.

177.    McCune jointly and severally employed Plaintiffs and other residents together with Recovery Connections and all other Defendants.

178.    Upon information and belief, McCune's annual gross volume of sales made or business done is not less than $500,000.

179.    Upon information and belief, the annual gross volume of sales made or business done by McCune and the other Defendants combined is not less than $500,000.

180.    McCune did not pay Plaintiffs and other Recovery Connections residents for their labor, which was for the primary benefit of McCune and all other Defendants, including the minimum wage for all hours worked or an overtime premium for hours worked in excess of 40 per workweek.

181.    McCune knew that it received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and other residents for the full value of this benefit.

**Integrity-Hominy Valley, LLC d/b/a Hominy Valley Retirement Center**

182.     Defendant Integrity-Hominy Valley, LLC d/b/a Hominy Valley ("Hominy Valley I") is a North Carolina corporation with its principal place of business located at 3053 South Church Street, Burlington, North Carolina, 27215.

183.     Upon information and belief, Hominy Valley I and Defendant Integrity-Candler 02 LLC d/b/a Hominy Valley Retirement Center are alter egos.

184.     Upon information and belief, Hominy Valley I operates an adult care home located at 2189 Smokey Park Highway, Candler, North Carolina, 28715.

185.     Hominy Valley I primarily engages in the care of the sick, the aged, or the mentally ill or disabled who reside on the premises of its locations.

186.     Pursuant to its contract with the RCC Defendants, Hominy Valley I employed Plaintiffs and similarly situated Recovery Connections residents within the meaning of the FLSA and the NCWHA.

187.     For example, Plaintiffs and other residents cleaned Hominy Valley I's facilities, washed laundry, bathed and fed Hominy Valley I's residents, changed residents' clothing and diapers, walked the halls to ensure that residents remained in bed, and administered medication to residents.

188.     At all times relevant to this lawsuit, Hominy Valley I had substantial control over the working conditions of Plaintiffs and similarly situated Recovery Connections residents, and over the unlawful policies and practices alleged herein.

189.     Upon information and belief, Hominy Valley I determined which residents could work for it.  For example, Hominy Valley I required Recovery Connections residents to have an

updated criminal background check on file, to submit to a urinalysis for drug testing, and to be vaccinated for tuberculosis.

190. Upon information and belief, Hominy Valley I asked Recovery Connections for staffing for certain shifts, and Recovery Connections assigned particular residents to work those shifts.

191. Upon information and belief, Hominy Valley I requested staffing from the labor pool of Recovery Connections residents knowing that residents were also working shifts at other Contracting Companies during the same workweek(s).

192. Hominy Valley I managers and other personnel trained, supervised, and directed the work of Plaintiffs and similarly situated Recovery Connections residents while they were assigned to work at Hominy Valley I's facilities.

193. Hominy Valley I directed Plaintiffs and similarly situated Recovery Connections residents to clean its facilities, wash laundry, bathe and feed its residents, change its residents' clothing and diapers, supervise its residents, and administer medication to its residents.

194. Hominy Valley I required Plaintiffs and similarly situated Recovery Connections residents to wear uniforms that conformed with Hominy Valley I standards.

195. Hominy Valley I provided Plaintiffs and similarly situated Recovery Connections residents with the facilities, equipment, tools, and other materials necessary to complete the work they performed.

196. Hominy Valley I tracked the collective hours worked by Plaintiffs and similarly situated Recovery Connections residents as a "crew" while they were assigned to work at Hominy Valley I's facilities.

197. Upon information and belief, Hominy Valley I paid the RCC Defendants for the aggregate labor performed by Plaintiffs and other Recovery Connections residents at regular intervals using a pre-negotiated sub-market rate, knowing that such payments would not be passed on to the individuals who performed the labor.

198. Upon information and belief, in or around May 2018, Hominy Valley I began tracking the hours worked by Plaintiffs and similarly situated Recovery Connections residents individually, rather than as a crew. However, Hominy Valley I continued to provide the payments for this work directly to the RCC Defendants.

199. Hominy Valley I and the RCC Defendants co-determined the discipline of Plaintiffs and similarly situated Recovery Connections residents. Upon information and belief, Hominy Valley I reported performance issues to the RCC Defendants, who then would issue discipline or negotiate with Hominy Valley I regarding discipline or the continued employment of the employee in question.

200. Hominy Valley I had the authority to terminate Plaintiffs and similarly situated Recovery Connections residents from further employment with Hominy Valley I.

201. Upon information and belief, Hominy Valley I and the RCC Defendants had an agreement that Hominy Valley I would not hire (or re-hire) former Recovery Connections residents, regardless of whether they had worked at Hominy Valley I during their time at Recovery Connections.

202. Hominy Valley I is a covered employer within the meaning of the FLSA and the NCWHA.

203. Hominy Valley I jointly and severally employed Plaintiffs and other residents together with Recovery Connections and all other Defendants.

28

204. Upon information and belief, Hominy Valley I's annual gross volume of sales made or business done is not less than $500,000.

205. Upon information and belief, the annual gross volume of sales made or business done by Hominy Valley I and the other Defendants combined is not less than $500,000.

206. Hominy Valley I did not pay Plaintiffs and other Recovery Connections residents for their labor, which was for the primary benefit of Hominy Valley I and all other Defendants, including the minimum wage for all hours worked or an overtime premium for hours worked in excess of 40 per workweek.

207. Hominy Valley I knew that it received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and the other residents for the full value of this benefit.

**Integrity-Candler 02 LLC d/b/a Hominy Valley Retirement Center**

208. Defendant Integrity-Candler 02 LLC d/b/a Hominy Valley Retirement Center ("Hominy Valley II"), is a North Carolina corporation with its principal place of business located at 3053 South Church Street, Burlington, North Carolina, 27215.

209. Upon information and belief, Hominy Valley I and Hominy Valley II operate as alter egos.

210. Upon information and belief, together with Hominy Valley I, Hominy Valley II operates an adult care home located at 2189 Smokey Park Highway, Candler, North Carolina, 28715.

211. Together with Hominy Valley I, Hominy Valley II primarily engages in the care of the sick, the aged, or the mentally ill or disabled who reside on the premises of their locations.

29

212. Pursuant to its contract with the RCC Defendants and together with Hominy Valley I, Hominy Valley II employed Plaintiffs and similarly situated Recovery Connections residents within the meaning of the FLSA and the NCWHA.

213. For example, Plaintiffs and other residents cleaned Hominy Valley II's facilities, washed laundry, bathed and fed Hominy Valley II's residents, changed residents' clothing and diapers, walked the halls to ensure that residents remained in bed, and administered medication to residents.

214. At all times relevant to this lawsuit, together with Hominy Valley I, Hominy Valley II had substantial control over the working conditions of Plaintiffs and similarly situated Recovery Connections residents, and over the unlawful policies and practices alleged herein.

215. Upon information and belief, together with Hominy Valley I, Hominy Valley II determined which residents could work for it. For example, together with Hominy Valley I, Hominy Valley II required Recovery Connections residents to have an updated criminal background check on file, to submit to a urinalysis for drug testing, and to be vaccinated for tuberculosis.

216. Upon information and belief, together with Hominy Valley I, Hominy Valley II asked Recovery Connections for staffing for certain shifts, and Recovery Connections assigned particular residents to work those shifts.

217. Upon information and belief, together with Hominy Valley I, Hominy Valley II requested staffing from the labor pool of Recovery Connections residents knowing that residents were also working shifts at other Contracting Companies during the same workweek(s).

218.    Together with Hominy Valley I, Hominy Valley II managers and other personnel trained, supervised, and directed the work of Plaintiffs and similarly situated Recovery Connections residents while they were assigned to work at Hominy Valley II's facilities.

219.    Together with Hominy Valley I, Hominy Valley II directed Plaintiffs and similarly situated Recovery Connections residents to clean its facilities, wash laundry, bathe and feed its residents, change its residents' clothing and diapers, supervise its residents and administer medication to its residents.

220.    Together with Hominy Valley I, Hominy Valley II required Plaintiffs and similarly situated Recovery Connections residents to wear uniforms that conformed with Hominy Valley II standards.

221.    Together with Hominy Valley I, Hominy Valley II provided Plaintiffs and similarly situated Recovery Connections residents with the facilities, equipment, tools, and other materials necessary to complete the work they performed.

222.    Together with Hominy Valley I, Hominy Valley II tracked the collective hours worked by Plaintiffs and similarly situated Recovery Connections residents as a "crew" while they were assigned to work at Hominy Valley II's facilities.

223.    Upon information and belief, together with Hominy Valley I, Hominy Valley II paid the RCC Defendants for the aggregate labor performed by Plaintiffs and other Recovery Connections residents at regular intervals using a pre-negotiated sub-market rate, knowing that such payments would not be passed on to the individuals who performed the labor.

224.    Upon information and belief, in or around May 2018, together with Hominy Valley I, Hominy Valley II began tracking the hours worked by Plaintiffs and similarly situated Recovery Connections residents individually, rather than as a crew.  However, together with

31

Hominy Valley I, Hominy Valley II continued to provide the payments for this work directly to the RCC Defendants.

225.    Together with Hominy Valley I, Hominy Valley II and the RCC Defendants co-determined the discipline of Plaintiffs and similarly situated Recovery Connections residents. Upon information and belief, Hominy Valley II reported performance issues to the RCC Defendants, who then would issue discipline or negotiate with Hominy Valley II regarding discipline or the continued employment of the employee in question.

226.    Together with Hominy Valley I, Hominy Valley II had the authority to terminate Plaintiffs and similarly situated Recovery Connections residents from further employment with Hominy Valley II.

227.    Upon information and belief, Hominy Valley II and the RCC Defendants had an agreement that Hominy Valley II would not hire (or re-hire) former Recovery Connections residents, regardless of whether they had worked at Hominy Valley II during their time at Recovery Connections.

228.    Together with Hominy Valley I, Hominy Valley II is a covered employer within the meaning of the FLSA and the NCWHA.

229.    Together with Hominy Valley I, Hominy Valley II jointly and severally employed Plaintiffs and other residents together with Recovery Connections and all other Defendants.

230.    Upon information and belief, Hominy Valley II's annual gross volume of sales made or business done is not less than $500,000.

231.    Upon information and belief, the annual gross volume of sales made or business done by Hominy Valley II and the other Defendants combined is not less than $500,000.

232.     Hominy Valley II did not pay Plaintiffs and other Recovery Connections residents for their labor, which was for the primary benefit of Hominy Valley II and all other Defendants, including the minimum wage for all hours worked or an overtime premium for hours worked in excess of 40 per workweek.

233.     Hominy Valley II knew that it received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and the other residents for the full value of this benefit.

**Integrity-Candler Living Center, LLC d/b/a Candler Living Center**

234.     Defendant Integrity-Candler Living Center, LLC d/b/a Candler Living Center ("Candler I") is a North Carolina limited liability company with its principal place of business located at 3054 South Church Street, Burlington, North Carolina, 27215.

235.     Upon information and belief, Candler I and Defendant Integrity-Candler 01 LLC d/b/a Candler Living Center operate as alter egos.

236.     Upon information and belief, Candler I operates an adult care home called Candler Living Center located at 136 Robinson Cove Road, Candler, North Carolina, 28715.

237.     Candler I primarily engages in the care of the sick, the aged, or the mentally ill or disabled who reside on the premises of its locations.

238.     Pursuant to its contract with the RCC Defendants, Candler I employed Plaintiffs and similarly situated Recovery Connections residents within the meaning of the FLSA and the NCWHA.

239.     For example, Plaintiffs and other residents cleaned Candler I's facilities, washed laundry, bathed and fed Candler I's residents, changed residents' clothing and diapers, walked the halls to ensure that residents remained in bed, and administered medication to residents.

33

240.    At all times relevant to this lawsuit, Candler I had substantial control over the working conditions of Plaintiffs and similarly situated Recovery Connections residents, and over the unlawful policies and practices alleged herein.

241.    Upon information and belief, Candler I determined which residents could work for it.  For example, Candler I required Recovery Connections residents to have an updated criminal background check on file, to submit to a urinalysis for drug testing, and to be vaccinated for tuberculosis.

242.    Upon information and belief, Candler I asked Recovery Connections for staffing for certain shifts, and Recovery Connections assigned particular residents to work those shifts.

243.    Upon information and belief, Candler I requested staffing from the labor pool of Recovery Connections residents knowing that residents were also working shifts at other Contracting Companies during the same workweek(s).

244.    Candler I managers and other personnel trained, supervised, and directed the work of Plaintiffs and similarly situated Recovery Connections residents while they were assigned to work at Candler I's facilities.

245.    Candler I directed Plaintiffs and similarly situated Recovery Connections residents to clean its facilities, wash laundry, bathe and feed its residents, change its residents' clothing and diapers, supervise its residents and administer medication to its residents.

246.    Candler I required Plaintiffs and similarly situated Recovery Connections residents to wear uniforms that conformed with Candler I standards.

247.    Candler I provided Plaintiffs and similarly situated Recovery Connections residents with the facilities, equipment, tools, and other materials necessary to complete the work they performed.

34

248.     Candler I tracked the collective hours worked by Plaintiffs and similarly situated Recovery Connections residents as a "crew" while they were assigned to work at Candler's facilities.

249.     Upon information and belief, Candler I paid the RCC Defendants for the aggregate labor performed by Plaintiffs and other Recovery Connections residents at regular intervals using a pre-negotiated sub-market rate, knowing that such payments would not be passed on to the individuals who performed the labor.

250.     Upon information and belief, in or around May 2018, Candler I began tracking the hours worked by Plaintiffs and similarly situated Recovery Connections residents individually, rather than as a crew.  However, Candler I continued to provide the payments for this work directly to the RCC Defendants.

251.     Candler I and the RCC Defendants co-determined the discipline of Plaintiffs and similarly situated Recovery Connections residents.  Upon information and belief, Candler I reported performance issues to the RCC Defendants, who then would issue discipline or negotiate with Candler I regarding discipline or the continued employment of the employee in question.

252.     Candler I had the authority to terminate Plaintiffs and similarly situated Recovery Connections residents from further employment with Candler I.

253.     Upon information and belief, Candler I and the RCC Defendants had an agreement that Candler I would not hire (or re-hire) former Recovery Connections residents, regardless of whether they had worked at Candler I during their time at Recovery Connections.

254.     Candler I is a covered employer within the meaning of the FLSA and the NCWHA.

255.     Candler I jointly and severally employed Plaintiffs and other residents together with Recovery Connections and all other Defendants.

256.     Upon information and belief, Candler I's annual gross volume of sales made or business done is not less than $500,000.

257.     Upon information and belief, the annual gross volume of sales made or business done by Candler I and the other Defendants combined is not less than $500,000.

258.     Candler I did not pay Plaintiffs and other Recovery Connections residents for their labor, which was for the primary benefit of Candler I and all other Defendants, including the minimum wage for all hours worked or an overtime premium for hours worked in excess of 40 per workweek.

259.     Candler I knew that it received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and the other residents for the full value of this benefit.

**Integrity-Candler 01 LLC d/b/a Candler Living Center**

260.     Defendant Integrity-Candler 01 LLC d/b/a Candler Living Center ("Candler II"), is a North Carolina limited liability company with its principal place of business located at 3054 South Church Street, Burlington, North Carolina, 27215.

261.     Upon information and belief, Candler I and Candler II operate as alter ego.

262.     Upon information and belief, together with Candler I, Candler II operates Candler Living Center, an adult care home located at 136 Robinson Cove Road, Candler, North Carolina, 28715.

263.     Together with Candler I, Candler II primarily engages in the care of the sick, the aged, or the mentally ill or disabled who reside on the premises of their locations.

36

264.     Pursuant to its contract with the RCC Defendants and together with Candler I, Candler II employed Plaintiffs and similarly situated Recovery Connections residents within the meaning of the FLSA and the NCWHA.

265.     For example, Plaintiffs and other residents cleaned Candler II's facilities, washed laundry, bathed and fed Candler II's residents, changed residents' clothing and diapers, walked the halls to ensure that residents remained in bed, and administered medication to residents.

266.     At all times relevant to this lawsuit, together with Candler I, Candler II had substantial control over the working conditions of Plaintiffs and similarly situated Recovery Connections residents, and over the unlawful policies and practices alleged herein.

267.     Upon information and belief, together with Candler I, Candler II determined which residents could work for it.  For example, together with Candler I, Candler II required Recovery Connections residents to have an updated criminal background check on file, to submit to a urinalysis for drug testing, and to be vaccinated for tuberculosis.

268.     Upon information and belief, together with Candler I, Candler II asked Recovery Connections for staffing for certain shifts, and Recovery Connections assigned particular residents to work those shifts.

269.     Upon information and belief, together with Candler I, Candler II requested staffing from the labor pool of Recovery Connections residents knowing that residents were also working shifts at other Contracting Companies during the same workweek(s).

270.     Together with Candler I, Candler II managers and other personnel trained, supervised, and directed the work of Plaintiffs and similarly situated Recovery Connections residents while they were assigned to work at Candler II's facilities.

271.     Together with Candler I, Candler II directed Plaintiffs and similarly situated Recovery Connections residents to clean its facilities, wash laundry, bathe and feed its residents, change its residents' clothing and diapers, supervise its residents and administer medication to its residents.

272.     Together with Candler I, Candler II required Plaintiffs and similarly situated Recovery Connections residents to wear uniforms that conformed with Candler II standards.

273.     Together with Candler I, Candler II provided Plaintiffs and similarly situated Recovery Connections residents with the facilities, equipment, tools, and other materials necessary to complete the work they performed.

274.     Together with Candler I, Candler II tracked the collective hours worked by Plaintiffs and similarly situated Recovery Connections residents as a "crew" while they were assigned to work at Candler II's facilities.

275.     Upon information and belief, together with Candler I, Candler II paid the RCC Defendants for the aggregate labor performed by Plaintiffs and other Recovery Connections residents at regular intervals using a pre-negotiated sub-market rate, knowing that such payments would not be passed on to the individuals who performed the labor.

276.     Upon information and belief, in or around May 2018, together with Candler I, Candler II began tracking the hours worked by Plaintiffs and similarly situated Recovery Connections residents individually, rather than as a crew.  However, together with Candler I, Candler II continued to provide the payments for this work directly to the RCC Defendants.

277.     Together with Candler I, Candler II and the RCC Defendants co-determined the discipline of Plaintiffs and similarly situated Recovery Connections residents.  Upon information and belief, Candler II reported performance issues to the RCC Defendants, who then would issue

38

discipline or negotiate with Candler II regarding discipline or the continued employment of the employee in question.

278. Together with Candler I, Candler II had the authority to terminate Plaintiffs and similarly situated Recovery Connections residents from further employment with Candler II.

279. Upon information and belief, Candler II and the RCC Defendants had an agreement that Candler II would not hire (or re-hire) former Recovery Connections residents, regardless of whether they had worked at Candler II during their time at Recovery Connections.

280. Together with Candler I, Candler II is a covered employer within the meaning of the FLSA and the NCWHA.

281. Together with Candler I, Candler II jointly and severally employed Plaintiffs and other residents together with Recovery Connections and all other Defendants.

282. Upon information and belief, Candler II's annual gross volume of sales made or business done is not less than $500,000.

283. Upon information and belief, the annual gross volume of sales made or business done by Candler II and the other Defendants combined is not less than $500,000.

284. Candler II did not pay Plaintiffs and other Recovery Connections residents for their labor, which was for the primary benefit of Candler II and all other Defendants, including the minimum wage for all hours worked or an overtime premium for hours worked in excess of 40 per workweek.

285. Candler II knew that it received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and the other residents for the full value of this benefit.

**Integrity Senior Properties Investments, LLC**

286.     Defendant Integrity Senior Properties Investments, LLC ("Integrity"), is a Florida limited liability company with its principal place of business located at 4821 United States Highway 19, Suite 3, New Port Richey, Florida, 34652.

287.     Upon information and belief, together with Hominy Valley I and Hominy Valley II, Integrity jointly operates an adult care home called Hominy Valley Retirement Center, located at 2189 Smokey Park Highway, Candler, North Carolina, 28715.

288.     Upon information and belief, together with Candler I and Candler II, Integrity jointly operates an adult care home called Candler Living Center, located at 136 Robinson Cove Road, Candler, North Carolina, 28715.

289.     Together with Hominy Valley I, Hominy Valley II, Candler I, and Candler II, Integrity primarily engages in the care of the sick, the aged, or the mentally ill or disabled who reside on the premises of their locations.

290.     Together with Hominy Valley I and Hominy Valley II, Integrity employed Plaintiffs and similarly situated Recovery Connections residents within the meaning of the FLSA and the NCWHA.

291.     Together with Candler I and Candler I, Integrity employed Plaintiffs and similarly situated Recovery Connections residents within the meaning of the FLSA and the NCWHA.

292.     For example, Plaintiffs and other residents cleaned Hominy Valley I, Hominy Valley II, Candler I, and Candler II's facilities, washed laundry, bathed and fed Hominy Valley I and Hominy Valley II's residents, changed residents' clothing and diapers, walked the halls to ensure that residents remained in bed, and administered medication to residents.

40

293.    At all times relevant to this lawsuit, Integrity, together with Hominy Valley I and Hominy Valley II, had substantial control over the working conditions of Plaintiffs and similarly situated Recovery Connections residents, and over the unlawful policies and practices alleged herein.

294.    At all times relevant to this lawsuit, Integrity, together with Candler I and Candler II, had substantial control over the working conditions of Plaintiffs and similarly situated Recovery Connections residents, and over the unlawful policies and practices alleged herein.

295.    Upon information and belief, Integrity, together with Hominy Valley I and Hominy Valley II, determined which residents could work for it.  For example, Integrity, together with Hominy Valley I and Hominy Valley II, required Recovery Connections residents to have an updated criminal background check on file, to submit to a urinalysis for drug testing, and to be vaccinated for tuberculosis.

296.    Upon information and belief, Integrity, together with Candler I and Candler II determined which residents could work for it.  For example, Integrity, together with Candler I and Candler II, required Recovery Connections residents to have an updated criminal background check on file, to submit to a urinalysis for drug testing, and to be vaccinated for tuberculosis.

297.    Upon information and belief, Integrity, together with Hominy Valley I and Hominy Valley II, asked Recovery Connections for staffing for certain shifts, and Recovery Connections assigned particular residents to work those shifts.

298.    Upon information and belief, Integrity, together with Hominy Valley I, Hominy Valley II requested staffing from the labor pool of Recovery Connections residents knowing that residents were also working shifts at other Contracting Companies during the same workweek(s).

41

299. Upon information and belief, Integrity, together with Candler I and Candler II, asked Recovery Connections for staffing for certain shifts, and Recovery Connections assigned particular residents to work those shifts.

300. Upon information and belief, Integrity, together with Candler I and Candler II, requested staffing from the labor pool of Recovery Connections residents knowing that residents were also working shifts at other Contracting Companies during the same workweek(s).

301. Together with Hominy Valley I and Hominy Valley II, Integrity managers and other personnel trained, supervised, and directed the work of Plaintiffs and similarly situated Recovery Connections residents while they were assigned to work at Hominy Valley I and Hominy Valley II's facilities.

302. Together with Candler I and Candler II, Integrity managers and other personnel trained, supervised, and directed the work of Plaintiffs and similarly situated Recovery Connections residents while they were assigned to work at Candler I and Candler II's facilities.

303. Together with Hominy Valley I and Hominy Valley II, Integrity directed Plaintiffs and similarly situated Recovery Connections residents to clean its facilities, wash laundry, bathe and feed its residents, change its residents' clothing and diapers, supervise its residents, and administer medication to its residents.

304. Together with Candler I and Candler II, Integrity directed Plaintiffs and similarly situated Recovery Connections residents to clean its facilities, wash laundry, bathe and feed its residents, change its residents' clothing and diapers, supervise its residents and administer medication to its residents.

305.    Together with Hominy Valley I and Hominy Valley II, Integrity required Plaintiffs and similarly situated Recovery Connections residents to wear uniforms that conformed with Hominy Valley I and Hominy Valley II standards.

306.    Together with Candler I and Candler II, Integrity required Plaintiffs and similarly situated Recovery Connections residents to wear uniforms that conformed with Candler I and Candler II standards.

307.    Together with Hominy Valley I and Hominy Valley II, Integrity provided Plaintiffs and similarly situated Recovery Connections residents with the facilities, equipment, tools, and other materials necessary to complete the work they performed.

308.    Together with Candler I and Candler II, Integrity provided Plaintiffs and similarly situated Recovery Connections residents with the facilities, equipment, tools, and other materials necessary to complete the work they performed.

309.    Together with Hominy Valley I and Hominy Valley II, Integrity tracked the collective hours worked by Plaintiffs and similarly situated Recovery Connections residents as a "crew" while they were assigned to work at Hominy Valley I and Hominy Valley II's facilities.

310.    Upon information and belief, together with Hominy Valley I and Hominy Valley II, Integrity paid the RCC Defendants for the aggregate labor performed by Plaintiffs and other Recovery Connections residents at regular intervals using a pre-negotiated sub-market rate, knowing that such payments would not be passed on to the individuals who performed the labor.

311.    Upon information and belief, in or around May 2018, Integrity, together with Hominy Valley I and Hominy Valley II, began tracking the hours worked by Plaintiffs and similarly situated Recovery Connections residents individually, rather than as a crew.  However,

Integrity, together with Hominy Valley I and Hominy Valley II continued to provide the payments for this work directly to the RCC Defendants.

312. Together with Candler I and Candler II, Integrity tracked the collective hours worked by Plaintiffs and similarly situated Recovery Connections residents as a "crew" while they were assigned to work at Candler I and Candler II's facilities.

313. Upon information and belief, together with Candler I and Candler II, Integrity paid the RCC Defendants for the aggregate labor performed by Plaintiffs and other Recovery Connections residents at regular intervals using a pre-negotiated sub-market rate, knowing that such payments would not be passed on to the individuals who performed the labor.

314. Upon information and belief, in or around May 2018, Integrity, together with Candler I and Candler II, began tracking the hours worked by Plaintiffs and similarly situated Recovery Connections residents individually, rather than as a crew. However, Integrity, together with Candler I and Candler II, continued to provide the payments for this work directly to the RCC Defendants.

315. Together with Hominy Valley I and Hominy Valley II, Integrity and the RCC Defendants co-determined the discipline of Plaintiffs and similarly situated Recovery Connections residents. Upon information and belief, Integrity, together with Hominy Valley I and Hominy Valley II, reported performance issues to the RCC Defendants, who then would issue discipline or negotiate with Integrity together with Hominy Valley I and Hominy Valley II regarding discipline or the continued employment of the employee in question.

316. Together with Candler I and Candler II, Integrity and the RCC Defendants co-determined the discipline of Plaintiffs and similarly situated Recovery Connections residents. Upon information and belief, Integrity, together with Candler I and Candler II, reported

performance issues to the RCC Defendants, who then would issue discipline or negotiate with Integrity together with Candler I and Candler II regarding discipline or the continued employment of the employee in question.

317.    Together with Hominy Valley I and Hominy Valley II, Integrity had the authority to terminate Plaintiffs and similarly situated Recovery Connections residents from further employment with Hominy Valley I and Hominy Valley II.

318.    Together with Candler I and Candler II, Integrity had the authority to terminate Plaintiffs and similarly situated Recovery Connections residents from further employment with Candler I and Candler II.

319.    Upon information and belief, together with Hominy Valley I and Hominy Valley II, Integrity and the RCC Defendants had an agreement that Integrity, together with Hominy Valley I and Hominy Valley II, would not hire (or re-hire) former Recovery Connections residents, regardless of whether they had worked at Hominy Valley I and Hominy Valley II during their time at Recovery Connections.

320.    Upon information and belief, together with Candler I and Candler II, Integrity and the RCC Defendants had an agreement that Integrity, together with Candler I and Candler II, would not hire (or re-hire) former Recovery Connections residents, regardless of whether they had worked at Candler I and Candler II during their time at Recovery Connections.

321.    Integrity is a covered employer within the meaning of the FLSA and the NCWHA.

322.    Together with Hominy Valley I and Hominy Valley II, Integrity jointly and severally employed Plaintiffs and other residents together with Recovery Connections and all other Defendants.

323.    Together with Candler I and Candler II, Integrity jointly and severally employed Plaintiffs and other residents together with Recovery Connections and all other Defendants.

324.    Upon information and belief, Integrity's annual gross volume of sales made or business done is not less than $500,000.

325.    Upon information and belief, the annual gross volume of sales made or business done by Integrity and the other Defendants combined is not less than $500,000.

326.    Integrity did not pay Plaintiffs and other Recovery Connections residents for their labor, which was for the primary benefit of Integrity and all other Defendants, including the minimum wage for all hours worked or an overtime premium for hours worked in excess of 40 per workweek.

327.    Integrity knew that it received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and the other residents for the full value of this benefit.

**Cedarbrook Residential Center, Inc.**

328.    Cedarbrook Residential Center, Inc. ("Cedarbrook"), is a North Carolina corporation with its principal place of business located at 1267 Pinnacle Church Road, Nebo, North Carolina, 28761.

329.    Cedarbrook operates an adult care home called the Cedarbrook Residential Center, located at 1267 Pinnacle Church Road, Nebo, North Carolina, 28761.

330.    Cedarbrook primarily engages in the care of the sick, the aged, or the mentally ill or disabled who reside on the premises of its locations.

331. Pursuant to its contract with the RCC Defendants, Cedarbrook employed Plaintiffs and similarly situated Recovery Connections residents within the meaning of the FLSA and the NCWHA.

332. For example, Plaintiffs and other residents cleaned Cedarbrook's facilities, washed laundry, bathed and fed Cedarbrook's residents, changed its residents' clothing and diapers, walked the halls to ensure that residents remained in bed, cooked meals, and administered medication to residents.

333. At all times relevant to this lawsuit, Cedarbrook had substantial control over the working conditions of Plaintiffs and similarly situated Recovery Connections residents while they were working at Cedarbrook, and over the unlawful policies and practices alleged herein.

334. Upon information and belief, Cedarbrook determined which residents could work for it.

335. Upon information and belief, Cedarbrook asked Recovery Connections for staffing for certain shifts, and Recovery Connections assigned particular residents to work those shifts.

336. Upon information and belief, Cedarbrook requested staffing from the labor pool of Recovery Connections residents knowing that residents were also working shifts at other Contracting Companies during the same workweek(s).

337. Cedarbrook managers and other personnel trained, supervised, and directed the work of Plaintiffs and similarly situated Recovery Connections residents while they were assigned to work at Cedarbrook's facilities.

338.     Cedarbrook directed Plaintiffs and similarly situated Recovery Connections residents to clean its facilities, wash laundry, bathe and feed its residents, change its residents' clothing and diapers, supervise its residents, and administer medication to its residents.

339.     Cedarbrook required Plaintiffs and similarly situated Recovery Connections residents to wear uniforms that conformed with Cedarbrook's standards.

340.     Cedarbrook provided Plaintiffs and similarly situated Recovery Connections residents with the facilities, equipment, tools, and other materials necessary to complete the work they performed.

341.     Cedarbrook tracked the collective hours worked by Plaintiffs and similarly situated Recovery Connections residents as a "crew" while they were assigned to work at Cedarbrook's job site.

342.     Upon information and belief, Cedarbrook paid the RCC Defendants for the aggregate labor performed by Plaintiffs and other Recovery Connections residents at regular intervals using a pre-negotiated sub-market rate, knowing that such payments would not be passed on to the individuals who performed the labor.

343.     Cedarbrook and the RCC Defendants co-determined the discipline of Plaintiffs and similarly situated Recovery Connections residents.  Upon information and belief, Cedarbrook reported performance issues to the RCC Defendants, who then would issue discipline or negotiate with Cedarbrook regarding discipline or the continued employment of the employee in question.

344.     Cedarbrook had the authority to terminate Plaintiffs and similarly situated Recovery Connections residents from further employment with Cedarbrook.

48

345.     Upon information and belief, Cedarbrook and the RCC Defendants had an agreement that Cedarbrook would not hire (or re-hire) former Recovery Connections residents, regardless of whether they had worked at Cedarbrook during their time at Recovery Connections.

346.     Cedarbrook is a covered employer within the meaning of the FLSA and the NCWHA.

347.     Cedarbrook jointly and severally employed Plaintiffs and other residents together with Recovery Connections and all other Defendants.

348.     Upon information and belief, Cedarbrook's annual gross volume of sales made or business done is not less than $500,000.

349.     Upon information and belief, the annual gross volume of sales made or business done by Cedarbrook and the other Defendants combined is not less than $500,000.

350.     Cedarbrook did not pay Plaintiffs and other Recovery Connections residents for their labor, which was for the primary benefit of Cedarbrook and all other Defendants, including the minimum wage for all hours worked or an overtime premium for hours worked in excess of 40 per workweek.

351.     Cedarbrook knew that it received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and other residents for the full value of this benefit.

**The Autumn Group, Inc d/b/a Oak Hill Living Center**

352.     Defendant The Autumn Group, Inc d/b/a Oak Hill Living Center ("Oak Hill") is a North Carolina corporation with its principal place of business located at 9767 North Carolina Highway 210 North, Angier, North Carolina, 27501.

353. Upon information and belief, Oak Hill operates an adult care home called the Oak Hill Living Center located at 9767 North Carolina Highway 210 North, Angier, North Carolina, 27501.

354. Oak Hill primarily engages in the care of the sick, the aged, or the mentally ill or disabled who reside on the premises of its locations.

355. Pursuant to its contract with the RCC Defendants, Oak Hill employed Plaintiffs and similarly situated Recovery Connections residents within the meaning of the FLSA and the NCWHA.

356. For example, Plaintiffs and other residents cleaned Oak Hill's facilities, washed laundry, bathed and fed Oak Hill's residents, changed residents' clothing and diapers, walked the halls to ensure that residents remained in bed, and administered medication to residents.

357. At all times relevant to this lawsuit, Oak Hill had substantial control over the working conditions of Plaintiffs and similarly situated Recovery Connections residents, and over the unlawful policies and practices alleged herein.

358. Upon information and belief, Oak Hill determined which residents could work for it. For example, Oak Hill required Recovery Connections residents to have an updated criminal background check on file, to submit to a urinalysis for drug testing, and to be vaccinated for tuberculosis.

359. Upon information and belief, Oak Hill asked Recovery Connections for staffing for certain shifts, and Recovery Connections assigned particular residents to work those shifts.

360. Upon information and belief, Oak Hill requested staffing from the labor pool of Recovery Connections residents knowing that residents were also working shifts at other Contracting Companies during the same workweek(s).

50

361.     Oak Hill managers and other personnel trained, supervised, and directed the work of Plaintiffs and similarly situated Recovery Connections residents while they were assigned to work at Oak Hill's facilities.

362.     Oak Hill directed Plaintiffs and similarly situated Recovery Connections residents to clean its facilities, wash laundry, bathe and feed its residents, change its residents' clothing and diapers, supervise its residents, and administer medication to its residents.

363.     Oak Hill required Plaintiffs and similarly situated Recovery Connections residents to wear uniforms that conformed with Oak Hill's standards.

364.     Oak Hill provided Plaintiffs and similarly situated Recovery Connections residents with the facilities, equipment, tools, and other materials necessary to complete the work they performed.

365.     Oak Hill tracked the collective hours worked by Plaintiffs and similarly situated Recovery Connections residents as a "crew" while they were assigned to work at Oak Hill's facilities.

366.     Upon information and belief, Oak Hill paid the RCC Defendants for the aggregate labor performed by Plaintiffs and other Recovery Connections residents at regular intervals using a pre-negotiated sub-market rate, knowing that such payments would not be passed on to the individuals who performed the labor.

367.     Upon information and belief, in or around May 2018, Oak Hill began tracking the hours worked by Plaintiffs and similarly situated Recovery Connections residents individually, rather than as a crew.  However, Oak Hill continued to provide the payments for this work directly to the RCC Defendants.

368.     Oak Hill and the RCC Defendants co-determined the discipline of Plaintiffs and similarly situated Recovery Connections residents.  Upon information and belief, Oak Hill reported performance issues to the RCC Defendants, who then would issue discipline or negotiate with Oak Hill regarding discipline or the continued employment of the employee in question.

369.     Oak Hill had the authority to terminate Plaintiffs and similarly situated Recovery Connections residents from further employment with Oak Hill.

370.     Upon information and belief, Oak Hill and the RCC Defendants had an agreement that Oak Hill would not hire (or re-hire) former Recovery Connections residents, regardless of whether they had worked at Oak Hill during their time at Recovery Connections.

371.     Oak Hill is a covered employer within the meaning of the FLSA and the NCWHA.

372.     Oak Hill jointly and severally employed Plaintiffs and other residents together with Recovery Connections and all other Defendants.

373.     Upon information and belief, Oak Hill's annual gross volume of sales made or business done is not less than $500,000.

374.     Upon information and belief, the annual gross volume of sales made or business done by Oak Hill and the other Defendants combined is not less than $500,000.

375.     Oak Hill did not pay Plaintiffs and other Recovery Connections residents for their labor, which was for the primary benefit of Oak Hill and all other Defendants, including the minimum wage for all hours worked or an overtime premium for hours worked in excess of 40 per workweek.

376.    Oak Hill knew that it received a benefit from the labor of Plaintiffs and similarly situated residents of Recovery Connections and should reasonably have expected to pay Plaintiffs and the other residents for the full value of this benefit.

## JURISDICTION AND VENUE

377.    The Court has subject matter jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' NCWHA, unjust enrichment, UDTPA, and conversion claims pursuant to 28 U.S.C. § 1367.

378.    Plaintiffs' NCWHA, unjust enrichment, UDTPA, and conversion claims are so closely related to their claims under the FLSA that they form part of the same case or controversy under Article III of the United States Constitution.

379.    This Court also has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

380.    The Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

381.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendants transact a substantial amount of business in this district, own and/or operate businesses located in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## COLLECTIVE ACTION ALLEGATIONS

382.    Plaintiffs bring the First and Second Causes of Action, FLSA minimum wage and overtime claims, on behalf of themselves and all similarly situated current and former residents of Recovery Connections who work or have worked for Recovery Connections and any other

Defendant, and who elect to opt-in to this action pursuant to 29 U.S.C. § 216(b) (the "FLSA Collective").

383. All of the work that Plaintiffs and the FLSA Collective have performed has been assigned by Defendants, and/or Defendants have been aware of all of the work that Plaintiffs and the FLSA Collective have performed.

384. As part of their regular business practice, Defendants have intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiffs and the FLSA Collective. This policy and pattern or practice includes, but is not limited to:

a. willfully failing to treat Plaintiffs and the FLSA Collective members as employees;

b. willfully failing to pay Plaintiffs and the FLSA Collective the minimum wage for all hours worked;

c. willfully failing to pay Plaintiffs and the FLSA Collective an overtime premium for hours that they worked in excess of 40 hours per workweek;

d. willfully failing to record all of the time that Plaintiffs and the FLSA Collective have worked for the benefit of Defendants; and

e. willfully failing to keep other records regarding the work performed by Plaintiffs and the FLSA Collective, as required by the FLSA.

385. Defendants are aware or should have been aware that federal law required them to pay Plaintiffs and the members of the FLSA Collective the minimum wage for all hours worked, and to pay an overtime premium for hours worked in excess of 40 per workweek.

386. Defendants' unlawful conduct has been widespread, repeated, and consistent.

387. Defendants' deceptive conduct prevented Plaintiffs and the FLSA Collective from discovering or asserting their claims earlier than they did.

388. Defendants are liable under the FLSA for, *inter alia*, failing to properly pay Plaintiffs and the FLSA Collective minimum wage and overtime payments due. Upon information and belief, the FLSA Collective consists of many similarly situated individuals who have not been paid or who have been underpaid by Defendants in violation of the FLSA and who would benefit from the issuance of a court-supervised notice of the lawsuit and the opportunity to join the lawsuit.

389. The members of the FLSA Collective are known to Defendants, are readily identifiable, and can be located through Defendants' records.

390. Notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

## CLASS ACTION ALLEGATIONS

## NORTH CAROLINA WAGE AND HOUR ACT CLASS

391. Plaintiffs bring the Third and Fourth Causes of Action (in the alternative), and the Fifth Causes of Action (collectively, the "NCWHA claims"), on behalf of themselves and a class of current and former residents at Recovery Connections who work or have worked for Defendants (the "NCWHA Class").

392. The members of the NCWHA Class identified above are so numerous that joinder of all members is impracticable. Although Plaintiffs do not know the precise number of such persons, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

393. Upon information and belief, the size of the NCWHA Class is at least 100 individuals.

394. Defendants have acted or refused to act on grounds generally applicable to the NCWHA Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the NCWHA Class as a whole.

395. Common questions of law and fact exist as to the NCWHA Class that predominate over any questions solely affecting individual members of the NCWHA Class, including but not limited to:

a. Whether Defendants failed to pay Plaintiffs and the members of the NCWHA Class the minimum wage for all hours worked for their benefit;

b. Whether Defendants failed to pay Plaintiffs and the members of the NCWHA Class an overtime premium for all hours worked over 40 in a workweek;

c. Whether Defendants failed to keep true and accurate records regarding the work performed by Plaintiffs and the NCHWA Class;

d. Whether Defendants failed to pay Plaintiffs and the members of the NCWHA Class all wages that accrued to them on a regular payday; and

e. The nature and extent of NCWHA Class-wide injury and the appropriate measure of damages for the NCWHA Class.

396. The claims of Plaintiffs are typical of the claims of the NCWHA Class they seek to represent. Plaintiffs and the NCWHA Class members work or have worked for Defendants and have not been compensated for all the hours they worked or all the wages they accrued. Plaintiffs and the NCWHA Class members have all sustained similar types of damages as a result of Defendants' failure to comply with the NCWHA.

397. Plaintiffs will fairly and adequately represent and protect the interests of the members of the NCWHA Class. Plaintiffs understand that, as class representatives, they assume

fiduciary responsibilities to the NCWHA Class to represent its interests fairly and adequately. Plaintiffs recognize that, as class representatives, they must represent and consider the interests of the NCWHA Class just as they would represent and consider their own interests. Plaintiffs understand that, in decisions regarding the conduct of the litigation and its possible settlement, they must not favor their own interests over those of the NCWHA Class. Plaintiffs recognize that any resolution of a class action lawsuit, including any settlement or dismissal thereof, must be in the best interests of the NCWHA Class. Plaintiffs understand that in order to provide adequate representation, they must remain informed of developments in the litigation, cooperate with class counsel, and testify, if required, at a deposition and/or trial.

398. Plaintiffs have retained counsel competent and experienced in complex class action employment litigation. There is no conflict between Plaintiffs and the NCWHA Class members.

399. A class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of wage litigation like the present action, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against numerous corporate and individual defendants. The members of the NCWHA Class have been damaged and are entitled to recovery as a result of Defendants' common and uniform policies, practices, and procedures. Although the relative damages suffered by individual members of the NCWHA Class have suffered are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation. In addition, class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

400.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3).

## UNJUST ENRICHMENT CLASS

401.     Plaintiffs bring the Sixth Cause of Action, the Unjust Enrichment claim, on behalf of themselves and a class of current and former residents at Recovery Connections who work or worked for Defendants without receiving payment for the value of their labor, at any time between September 27, 2015, and the date of final judgment in this matter (the "Unjust Enrichment Class").

402.     The members of the Unjust Enrichment Class identified above are so numerous that joinder of all members is impracticable.  Although Plaintiffs do not know the precise number of such persons, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

403.     Upon information and belief, the size of the Unjust Enrichment Class is at least 100 individuals.

404.     Common questions of law and fact exist as to the Unjust Enrichment Class that predominate over any questions solely affecting individual members of the Unjust Enrichment Class, including but not limited to:

a.     Whether Defendants accepted the labor of Plaintiffs and the members of the Unjust Enrichment Class;

b.     Whether Defendants reasonably should have expected to compensate Plaintiffs and the members of the Unjust Enrichment Class for the value of their labor;

c.     Whether Defendants failed to pay Plaintiffs and the members of the Unjust Enrichment Class for the value of their labor; and

d.      The nature and extent of Unjust Enrichment Class-wide injury and the appropriate measure of damages for the Unjust Enrichment Class.

405.    The claims of Plaintiffs are typical of the claims of the Unjust Enrichment Class they seek to represent.  Plaintiffs and the Unjust Enrichment Class members work or have worked for Defendants and have not been compensated for the value of their labor.  Plaintiffs and the Unjust Enrichment Class members have all sustained similar types of damages as a result of Defendants' failure to compensate them for the value of their labor.

406.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Unjust Enrichment Class.  Plaintiffs understand that, as class representatives, they assume fiduciary responsibilities to the Unjust Enrichment Class to represent its interests fairly and adequately.  Plaintiffs recognize that, as class representatives, they must represent and consider the interests of the Unjust Enrichment Class just as they would represent and consider their own interests.  Plaintiffs understand that, in decisions regarding the conduct of the litigation and its possible settlement, they must not favor their own interests over those of the Unjust Enrichment Class.  Plaintiffs recognize that any resolution of a class action lawsuit, including any settlement or dismissal thereof, must be in the best interests of the Unjust Enrichment Class. Plaintiffs understand that in order to provide adequate representation, they must remain informed of developments in the litigation, cooperate with class counsel, and testify, if required, at a deposition and/or trial.

407.    Plaintiffs have retained counsel competent and experienced in complex class action employment litigation.  There is no conflict between Plaintiffs and the Unjust Enrichment Class members.

408.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of litigation like the present action, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against numerous corporate and individual defendants.  The members of the Unjust Enrichment Class have been damaged and are entitled to recovery as a result of Defendants' common and uniform policies, practices, and procedures.  Although the relative damages suffered by individual members of the Unjust Enrichment Class have suffered are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation.  In addition, class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

409.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3).

**NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT CLASS**

410.     Plaintiffs bring the Seventh Cause of Action, the UDTPA claim, on behalf of themselves and a class of current and former residents at Recovery Connections who were induced to work for the RCC Defendants without pay at any time between September 27, 2014, and the date of final judgment in this matter (the "UDTPA Class").

411.     The members of the UDTPA Class identified above are so numerous that joinder of all members is impracticable.  Although Plaintiffs do not know the precise number of such persons, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

412.     Upon information and belief, the size of the UDTPA Class is at least 100 individuals.

413.     Common questions of law and fact exist as to the UDTPA Class that predominate over any questions solely affecting individual members of the UDTPA Class, including but not limited to:

a.     Whether the RCC Defendants engaged in unfair or deceptive practices by holding themselves out as rehabilitation support service providers and promising rehabilitation services to Plaintiffs and the members of the UDTPA Class and instead requiring them to work many hours each week without compensation while not providing any meaningful rehabilitation services;

b.     Whether, in operating in accordance with the allegations herein, the RCC Defendants took action in or affecting commerce; and

c.     The nature and extent of UDTPA Class-wide injury and the appropriate measure of damages for the UDTPA Class.

414.     The claims of Plaintiffs are typical of the claims of the UDTPA Class they seek to represent.  Plaintiffs and the UDTPA Class members were promised rehabilitation services and instead were required to work many hours each week without compensation.  Plaintiffs and the UDTPA Class members have all sustained similar types of damages as a result of Defendants' violation of the UDTPA.

415.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the UDTPA Class.  Plaintiffs understand that, as class representatives, they assume fiduciary responsibilities to the UDTPA Class to represent its interests fairly and adequately.  Plaintiffs recognize that, as class representatives, they must represent and consider the interests

of the UDTPA Class just as they would represent and consider their own interests. Plaintiffs understand that, in decisions regarding the conduct of the litigation and its possible settlement, they must not favor their own interests over those of the UDTPA Class. Plaintiffs recognize that any resolution of a class action lawsuit, including any settlement or dismissal thereof, must be in the best interests of the UDTPA Class. Plaintiffs understand that in order to provide adequate representation, they must remain informed of developments in the litigation, cooperate with class counsel, and testify, if required, at a deposition and/or trial.

416. Plaintiffs have retained counsel competent and experienced in complex class action litigation. There is no conflict between Plaintiffs and the UDTPA Class members.

417. A class action is superior to other available methods for the fair and efficient adjudication of this litigation—particularly in the context of litigation like the present action, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against numerous corporate and individual defendants. The members of the UDTPA Class have been damaged and are entitled to recovery as a result of the RCC Defendants' common and uniform policies, practices, and procedures. Although the relative damages suffered by individual members of the UDTPA Class have suffered are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation. In addition, class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about the RCC Defendants' practices.

418. This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3).

## CONVERSION CLASS

419.    Plaintiffs bring the Eighth Cause of Action, the Conversion claim, on behalf of themselves and a class of current and former residents whose wages for work performed were converted by the RCC Defendants, between September 27, 2015, and the date of final judgment in this matter (the "Conversion Class").

420.    The members of the Conversion Class identified above are so numerous that joinder of all members is impracticable.  Although Plaintiffs do not know the precise number of such persons, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

421.    Upon information and belief, the size of the Conversion Class is at least 100 individuals.

422.    Common questions of law and fact exist as to the Conversion Class that predominate over any questions solely affecting individual members of the Conversion Class, including but not limited to:

a.      Whether the RCC Defendants retained and withheld wages paid for work performed by Plaintiffs and the Conversion Class members; and

b.      The nature and extent of Conversion Class-wide injury and the appropriate measure of damages for the Conversion Class.

423.    The claims of Plaintiffs are typical of the claims of the Conversion Class they seek to represent.  Plaintiffs and the Conversion Class members are all former residents whose wages Recovery Connections appropriated.  Plaintiffs and the Conversion Class members have all sustained similar types of damages because of the RCC Defendants' appropriation of their wages.

424.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Conversion Class.  Plaintiffs understand that, as class representatives, they assume a fiduciary responsibility to the Conversion Class to represent its interests fairly and adequately.  Plaintiffs recognize that, as class representatives, they must represent and consider the interests of the Conversion Class just as they would represent and consider their own interests.  Plaintiffs understand that, in decisions regarding the conduct of the litigation and its possible settlement, they must not favor their own interests over those of the Conversion Class.  Plaintiffs recognize that any resolution of a class action lawsuit, including any settlement or dismissal thereof, must be in the best interests of the Conversion Class.  Plaintiffs understand that in order to provide adequate representation, they must remain informed of developments in the litigation, cooperate with class counsel, and testify, if required, at a deposition and/or trial.

425.     Plaintiffs have retained counsel competent and experienced in complex class action litigation.  There is no conflict between Plaintiffs and the Conversion Class members.

426.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of litigation like the present action, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against numerous corporate and individual defendants.  The members of the Conversion Class have been damaged and are entitled to recovery as a result of the RCC Defendants' common and uniform policies, practices, and procedures.  Although the relative damages suffered by individual members of the Conversion Class have suffered are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation.  In addition, class treatment is superior because it will obviate the need for

unduly duplicative litigation that might result in inconsistent judgments about the RCC Defendants' practices.

427. This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3).

## **COMMON FACTUAL ALLEGATIONS**

428. Plaintiffs and the members of the FLSA Collective, the NCWHA Class, the Unjust Enrichment Class, the UDTPA Class, and the Conversion Class, as defined above (collectively, "Class Members") have been victims of a common policy and plan perpetrated by Defendants that has violated their rights under the FLSA, the NCWHA, the UDTPA, and common law.

429. Recovery Connections holds itself out as a live-in substance abuse recovery and rehabilitation service provider.

430. The RCC Defendants advertise their program via the internet, recruit program residents from other substance abuse rehabilitation providers, and seek referrals of individuals with substance abuse problems facing criminal charges through judicial and probation personnel.

431. The RCC Defendants inform prospective program residents that Recovery Connections will provide them with substance abuse education, substance addiction assessments by certified professionals, life skills and vocational training, "community support groups and resources," "animal and equine therapy," and aftercare.[5]

432. The RCC Defendants claim that the Recovery Connections program offerings foster "healthy relationships," "productive habits," and a "foundation of life skills."[6]

---

[5]   *Mission*, *supra* note 1; *About*, *supra* note 1.
[6]   *Mission*, *supra* note 1.

433. Plaintiffs and Class Members enrolled in the Recovery Connections program to overcome substance abuse.

434. Plaintiffs and Class Members did not enroll in the Recovery Connections program to provide free labor.

435. Plaintiffs and Class Members reasonably relied on the RCC Defendants' advertisements and representations when enrolling in the Recovery Connections program.

436. The RCC Defendants advertised the Recovery Connections program knowing that Plaintiffs' and Class Members' struggles with substance abuse made them vulnerable to deceptive practices.

437. The RCC Defendants engaged in deceptive conduct by failing to provide Plaintiffs and Class Members with any *bona fide* substance abuse education, counseling, training, or other professional services, and instead requiring Plaintiffs and Class Members to work long hours of arduous labor without pay.

438. Plaintiffs and Class Members were economically dependent on the RCC Defendants for extended periods of time during their residency at Recovery Connections.

439. The RCC Defendants did not allow Plaintiffs and Class Members to transport themselves to off-site locations while they resided in the program; instead, the RCC Defendants required Plaintiffs and Class Members to use Recovery Connections vehicles operated by the RCC Defendants as their sole means of transportation.

440. The RCC Defendants did not permit Plaintiffs and Class Members to work for employers other than Defendants while they were enrolled in the Recovery Connections program.

441.    The RCC Defendants did not allow Plaintiffs and Class Members to bring any money, cell phone, books, magazines, or any personal items of value when they entered the program.

442.    Upon information and belief, the RCC Defendants did not allow Plaintiffs and Class Members to obtain their own medication while they resided in the program; the RCC Defendants took Plaintiffs' and Class Members' prescriptions and medications, locked their medications in a safe, and authorized one person to distribute all medications.

443.    The RCC Defendants did not allow Plaintiffs and Class Members to take certain kinds of medicine for fear that it would interfere with their ability to perform work.

444.    The RCC Defendants isolated Plaintiffs and Class Members while they resided at Recovery Connections by prohibiting contact with families and friends and confiscating any cell phones.

445.    The RCC Defendants did not allow Plaintiffs or Class Members to receive any packages or communications from friends and family members during the first 6 months of the program.

446.    The RCC Defendants required Plaintiffs and Class Members to assign their food stamps over to the RCC Defendants for the RCC Defendants' primary benefit, while depriving Plaintiffs and Class Members of adequate food and nutrition.

447.    The RCC Defendants provided Plaintiffs and Class Members with some meals. However, the food was largely donated by local food banks, and sometimes contained rotten meat and expired food, and Class Members were required to prepare what meals were provided.

448.    The RCC Defendants provided unsafe, unsanitary, and inadequate group housing for Plaintiffs and Class Members.

449. For example, at times, Class Members were required to go without running water. At other times, they were subjected to extreme temperature, mold, bedbug infestations, dangerous and/or damaged fixtures, overcrowding, and other intolerable living conditions.

450. Upon information and belief, the RCC Defendants' provision of housing to Plaintiffs and Class Members violated state and local law, including housing codes, applicable in the counties in which the RCC Defendants operated.

451. The RCC Defendants subjected Plaintiffs and Class Members to psychologically harmful group sessions, which they claimed to be therapy. During these mandatory group sessions, the RCC Defendants degraded Plaintiffs and Class Members and required their fellow residents to surround them in a circle and scream insults at them. These sessions could last for long periods and often occurred late at night, causing residents to be deprived of adequate sleep.

452. The RCC Defendants required Plaintiffs and Class Members to work as part of the Recovery Connections program.

453. Although the RCC Defendants notified prospective residents that performing work would be a part of the program, they did not disclose the nature and extent of the work.

454. The RCC Defendants deprived Plaintiffs and Class Members of adequate sleep by subjecting Plaintiffs and Class Members to a grueling work schedule.

455. The RCC Defendants required Plaintiffs and Class Members to wake up at 6 a.m. and work multiple shifts, often for as many as 16-hours per day or more, for the Contracting Companies.

456. The RCC Defendants often required Plaintiffs and Class Members to perform additional work for the RCC Defendants before and after their shifts for the Contracting Companies.

68

457.    Jennifer Warren often required Plaintiffs and Class Members to clean her house, feed and water her animals, clean the quarters of her animals' spaces, care for her children, and run her errands.

458.    The RCC Defendants imposed harsh punishments if Class Members refused to work or violated any of the RCC Defendants' or Contracting Companies' rules. Such punishments included, for example, having to cut the front lawn with a pair of scissors or scrubbing baseboards with a small toothbrush.

459.    The RCC Defendants engaged in deception and an inequitable assertion of power over Plaintiffs and Class Members, individuals recovering from substance abuse, by telling these individuals that, in order to recover from substance use, they needed to work long hours of uncompensated labor without adequate housing, sleep or nutrition, participate in abusive group "therapy," be isolated from family and friends, and be subjected to draconian discipline practices for non-compliance.

460.    Upon information and belief, the Contracting Companies entered into agreements to fluidly share a labor pool of workers supplied by the RCC Defendants.

461.    Upon information and belief, the RCC Defendants provided the labor pool, consisting of Plaintiffs and Class Members, that the Contracting Companies agreed to share amongst themselves.

462.    The RCC Defendants and the Contracting Companies entered into agreements whereby the Contracting Companies compensated Recovery Connections at an hourly rate for each hour of Plaintiffs' and Class Members' work that was recorded by the Contracting Companies and/or the RCC Defendants. Upon information and belief, such labor agreements covered periods ranging from 90 days to one year.

69

463.     The RCC Defendants and the Contracting Companies negotiated the hourly rates at which the Contracting Companies compensated Recovery Connections for the labor of Plaintiffs and Class Members.  The negotiated rates were often sub-market, that is, lower than the hourly rates paid by other competing business for similar work in the area.

464.     Upon information and belief, the Contracting Companies requested a specified number of shifts to be worked by members of the labor pool consisting of Plaintiffs and Class Members during each work period, knowing that Plaintiffs and Class Members were also working shifts at other Contracting Companies during the same period.

465.     The Contracting Companies and the RCC Defendants agreed that the RCC Defendants would assign Plaintiffs and Class Members to work shifts at each of the Contracting Companies' locations.

466.     The RCC Defendants rotated Plaintiffs and Class Members to work shifts among the Contracting Companies on a daily, weekly, and monthly basis.  Plaintiffs and Class Members were often assigned to work an eight-hour shift for one Contracting Company, and then a second back-to-back eight-hour shift for a different Contracting Company, on the same day.

467.     The Contracting Companies and the RCC Defendants agreed that the RCC Defendants would transport Plaintiffs and Class Members to and from their work shifts in vehicles owned and/or operated by the RCC Defendants and their staff.

468.     Through this arrangement, the RCC Defendants agreed to provide the Contracting Companies with a rotating pool of employees to continually meet their labor needs throughout the day.

469.     Despite knowing that Plaintiffs and Class Members worked far more than 40 hours per week, the RCC Defendants and Contracting Companies unlawfully agreed that the

Contracting Companies would not compensate Plaintiffs or Recovery Connections at an overtime premium rate for hours worked in excess of 40 per week by Plaintiffs and Class Members. Rather, the Contracting Companies paid Recovery Connections the same negotiated rate for all hours worked by Plaintiffs and Class Members without regard to federal and state overtime requirements.

470.    Upon information and belief, the RCC Defendants and Contracting Companies also unlawfully agreed to treat residents as non-employees, and thereby avoided paying workers' compensation, insurance (such as unemployment and health insurance) and other benefits for Plaintiffs' and Class Members' labor, which they otherwise would have had to pay had they lawfully secured staffing through other means.

471.    Upon information and belief, each Contracting Company had the authority to determine which residents were eligible to perform work on its behalf.

472.    The Contracting Companies, formally and as a matter of practice, shared the power to direct, control, and supervise Plaintiffs and Class Members, with the RCC Defendants and with one another.

473.    The Contracting Companies supervised and directed the work of Plaintiffs and Class Members while they were assigned to work at the Contracting Companies' job sites.

474.    The Contracting Companies required Plaintiffs and Class Members to wear uniforms that conformed with the Contracting Companies' standards.

475.    The Contracting Companies provided Plaintiffs and Class Members with the facilities, equipment, tools, uniforms, and other materials necessary to complete the work they performed.

71

476.   The RCC Defendants tracked hours worked by Plaintiffs and Class Members for the Contracting Companies.

477.   On information and belief, the Contracting Companies did not track Plaintiffs' and Class Members' hours on an individual basis, but rather tracked Class Members' collective hours of work as a "crew" in accordance with their labor pooling agreements with the RCC Defendants.

478.   Upon information and belief, the Contracting Companies required Plaintiffs and Class Members to sign in and out and/or "punch" a manual or electronic time card, to track their hours under a generic code used for all members of the Recovery Connections labor pool.

479.   Upon information and belief, the Contracting Companies and the RCC Defendants reconciled their records of hours worked by labor pool members, including Plaintiffs and Class Members, before the end of every pay period.

480.   Upon information and belief, the RCC Defendants sent each Contracting Company an invoice for all labor pool hours worked by Plaintiffs and Class Members during the pay period.

481.   Upon information and belief, each Contracting Company provided a check to the RCC Defendants in satisfaction of each invoice every pay period.

482.   Upon information and belief, in or around May 2018, at least some of the Contracting Companies began tracking the hours worked by each Plaintiff and similarly situated Recovery Connections resident individually, rather than as a crew.  However, the Contracting Companies continued to provide the payments for this work directly to the RCC Defendants.

483.     Upon information and belief, the RCC Defendants failed to keep true and accurate records of the work that Plaintiffs and Class Members performed directly for the RCC Defendants.

484.     In addition, the RCC Defendants and Contracting Companies failed to keep true and accurate records of the overtime hours worked by Plaintiffs and each Class Member.

485.     The Contracting Companies and the RCC Defendants shared information and cooperated together in making personnel and discipline decisions involving Plaintiffs and Class Members.

486.     For example, the RCC Defendants and Contracting Companies agreed to prohibit certain Class Members from continuing to work at the Contracting Companies' job sites based on performance or discipline issues.

487.     Upon information and belief, each Contracting Company could determine when to fire a Class Member and forever bar them from performing further work on its behalf.

488.     Upon information and belief, the Contracting Companies agreed with the RCC Defendants that they would not re-hire former residents of the Recovery Connections program.

489.     Jennifer Warren and/or Phillip Warren supervised Plaintiffs and Class Members when they performed work for the RCC Defendants.

490.     Jennifer Warren and/or Phillip Warren supervised Plaintiffs and Class Members when they performed work for Jennifer Warren and/or Phillip Warren in their personal home or of a personal nature, such as running errands.

491.     The RCC Defendants provided Plaintiffs and Class Members with the facilities, equipment, tools, uniforms, and other materials necessary when Plaintiffs and Class Members performed work for the RCC Defendants.

492.     Plaintiffs and Class Members did not receive compensation from Defendants for their labor, except that certain Contracting Companies may have compensated Plaintiffs and Class Members directly for at least a portion of their labor performed during the last pay period during which they worked.

493.     Upon information and belief, the Contracting Companies and RCC Defendants knew that Plaintiffs and Class Members were not compensated for their labor, except as noted in paragraph 492 above.

494.     Although the RCC Defendants received compensation from the Contracting Companies for Plaintiffs' and Class Members' work, the RCC Defendants did not pass any portion of this compensation on to Plaintiffs or Class Members.

495.     Defendants did not issue paychecks, notices of wages, hours worked, required deductions or any other wage-related information to Plaintiffs and Class Members.

496.     Defendants were the primary beneficiary of their relationships with Plaintiffs and Class Members.

497.     By not paying the individuals who performed the work, the RCC Defendants' deceptive conduct allowed them to provide labor to the Contracting Companies at sub-market wage rates.

498.     The RCC Defendants benefitted financially by receiving compensation from the Contracting Companies for Plaintiffs' and Class Members' labor, which they themselves, did not perform.

499.     The RCC Defendants also benefitted by receiving the value of Plaintiffs' and Class Members' labor and services without paying for such labor or services.

500.    The Contracting Companies benefitted financially by their use of sub-market wage labor provided by Plaintiffs and Class Members.

501.    Upon information and belief, the Contracting Companies also jointly used their labor pooling arrangement with the RCC Defendants to avoid paying for the full value of Plaintiffs' and Class Members' labor, including by not paying overtime premiums, workers' compensation, unemployment and health insurance, and other benefits they otherwise would have had to pay had they lawfully secured staffing through other means.

502.    Defendants' labor pooling arrangement was not an isolated, short-term, or incidental agreement.  Rather, the RCC Defendants and Contracting Companies regularly and continually agreed to contract for the use of Plaintiffs' and Class Members' labor over contract periods ranging from 90 days to 1 year, and often continuing by subsequent contract for several years, knowing that Plaintiffs and Class Members were not being compensated for their work.

503.    Defendants collectively gained a competitive advantage over similar employers who paid the lawful minimum wage or market wage and overtime premium wage to their employees.

504.    Each Defendant jointly and severally employed Plaintiffs and Class Members together with all other Defendants.

505.    The Contracting Companies and the RCC Defendants together had combined influence over the essential terms and conditions of the activities of Plaintiffs and Class Members, which gave rise to an employer-employee relationship.

506.    Defendants qualify as joint employers who are together responsible for the work performed by Plaintiffs and Class Members.

507. As part of their ongoing business practices, Defendants intentionally, willfully, and repeatedly harmed Plaintiffs and Class Members by engaging in a pattern, practice, and/or policy of violating the FLSA and the NCWHA as described in this Class and Collective Action Complaint.

508. The RCC Defendants' failure to provide adequate food, housing, recovery support, substance abuse education, or other services did not convert Plaintiffs' and Class Members' purpose into a desire to work gratuitously.

509. The RCC Defendants' policy and practice of requiring Plaintiffs and Class Members to work without pay for Defendants' sole benefit under the pretense that unpaid work is a component of a legitimate recovery support program is deceptive, oppressive, and illegal.

510. The RCC Defendants' deceptive actions proximately caused injury to Plaintiffs and Class Members.

511. The RCC Defendants accepted, retained, and converted wages owed to Plaintiffs and Class Members for their labor for the Contracting Companies.

512. Defendants' unlawful conduct has been widespread, repeated, and consistent.

513. Defendants' policies and practices as described herein are ongoing.

514. Upon information and belief, Defendants' unlawful conduct described in this Class and Collective Action Complaint has been pursuant to a policy or practice of maximizing profits by knowingly denying Plaintiffs and Class Members proper compensation in violation of the FLSA and the NCWHA.

515. Defendants' deceptive conduct prevented Plaintiffs and Class Members from discovering or asserting their claims any earlier than they did.

76

516.     The RCC Defendants' failure to post notice or otherwise notify Plaintiffs and Class Members of their rights as employees under the FLSA prevented Plaintiffs and Class Members from discovering or asserting their claims earlier than they did.

517.     Plaintiffs and Class Members were directly harmed by Defendants' policies and practices.

## FIRST CAUSE OF ACTION
### Fair Labor Standards Act – Unpaid Minimum Wages
### (On Behalf of Plaintiffs and the FLSA Collective Against All Defendants)

518.     Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

519.     Defendants failed to pay Plaintiffs and the FLSA Collective the minimum wages to which they are entitled under the FLSA.

520.     Defendants jointly "employed" Plaintiffs and the FLSA Collective members as "employees" within the meaning of the FLSA.

521.     Defendants suffered or permitted Plaintiffs and the FLSA Collective to work many hours each week.

522.     Plaintiffs' and the FLSA Collective members' work financially benefited the Contracting Companies by reducing the demands on their paid employees and artificially reducing their labor costs through access to a steady supply of sub-market rate labor for which the Contracting Companies did not provide unemployment and health insurance, worker's compensation, minimum wages, and/or overtime premiums.

523.     Plaintiffs and the FLSA Collective performed work that was integral and necessary to the Contracting Companies' operations.

524. Plaintiffs' and the FLSA Collective members' work financially benefited the RCC Defendants through payments the RCC Defendants received from the Contracting Companies based on work performed by Plaintiffs and the FLSA Collective.

525. Plaintiffs' and the FLSA Collective members' work also financially benefitted the RCC Defendants through the work FLSA Collective members performed directly for the RCC Defendants without pay.

526. Each Defendant exercised substantial control over the terms and conditions of Plaintiffs' and the FLSA Collective members' work.

527. Defendants jointly exercised substantial control over the terms and conditions of Plaintiffs' and the FLSA Collective members' work.

528. The Contracting Companies are employers engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 203(d), 203(s), 203(r), and 206(a).

529. The Contracting Companies are also covered enterprises within the meaning of 29 U.S.C. § 203(s)(1)(B).

530. Recovery Connections and Journey to Recovery are employers engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 203(d), 203(s), 203(r), and 206(a).

531. Jennifer Warren and Phillip Warren are individuals acting directly or indirectly in the interests of Defendants for purposes of 29 U.S.C. § 203(d).

532. At all relevant times, Plaintiffs and the FLSA Collective were employees employed by Defendants within the meaning of 29 U.S.C. §§ 203(e) and 206(a).

533. As a result of Defendants' violations of the FLSA, Plaintiffs and the FLSA Collective suffered damages by being denied minimum wages in accordance with the FLSA in amounts to be determined at trial, and are entitled to recovery of such amounts; liquidated damages; prejudgment interest; and attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

534. Defendants' unlawful conduct, as described in this Class and Collective Action Complaint, has been intentional and willful.

535. Defendants were aware or should have been aware that the practices described in this Class and Collective Action Complaint were unlawful.

536. Defendants have not made a good faith effort to comply with the FLSA with respect to Plaintiffs' and Collective Members' compensation.

**SECOND CAUSE OF ACTION**
**Fair Labor Standards Act – Unpaid Overtime**
**(On Behalf of Plaintiffs and the FLSA Collective Against All Defendants)**

537. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

538. The overtime provisions set forth in the FLSA, 29 U.S.C. §§ 201, *et seq*., and the supporting federal regulations, apply to Defendants and protect Plaintiffs and the FLSA Collective.

539. Defendants failed to pay Plaintiffs and the FLSA Collective the overtime wages to which they are entitled under the FLSA.

540. Defendants jointly "employed" Plaintiffs and the FLSA Collective members as "employees" within the meaning of the FLSA.

541. Defendants suffered or permitted Plaintiffs and the FLSA Collective to work many hours each week, including hours in excess of 40 per workweek.

542. Plaintiffs' and the FLSA Collective members' work financially benefited the Contracting Companies by reducing the demands on their paid employees and artificially reducing labor costs through access to a steady supply of sub-market rate labor for which the Contracting Companies did not provide unemployment and health insurance, worker's compensation, minimum wages, and/or overtime premiums.

543. As a result of Defendants' violations of the FLSA, Plaintiffs and the FLSA Collective suffered damages by being denied overtime wages in accordance with the FLSA in amounts to be determined at trial, and are entitled to recovery of such amounts; liquidated damages; prejudgment interest; and attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

544. Defendants' unlawful conduct, as described in this Class and Collective Action Complaint, has been intentional and willful.

545. Defendants were aware or should have been aware that the practices described in this Class and Collective Action Complaint were unlawful.

546. Defendants have not made a good faith effort to comply with the FLSA with respect to Plaintiffs' and the FLSA Collective members' compensation.

**THIRD CAUSE OF ACTION (IN THE ALTERNATIVE)**
**North Carolina Wage and Hour Act – Unpaid Minimum Wages**
**(On Behalf of Plaintiffs and the NCWHA Class Against All Defendants)**

547. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

548. Alternatively, if Plaintiffs and the NCWHA Class members are found to be exempt from the FLSA, the foregoing conduct, as alleged, violates the NCWHA.

549. At all relevant times, Defendants have been, and continue to be, "employers" that jointly employ individuals within the meaning of the NCWHA.

550. At all relevant times, Defendants have employed, and continue to employ, "employees," including Plaintiffs and NCWHA Class members, within the meaning of the NCWHA.

551. At all relevant times, Defendants have had a policy and practice of failing and refusing to pay minimum wages to Plaintiffs and the NCWHA Class for all hours worked in violation of the NCWHA.

552. In the event Plaintiffs and the NCWHA Class are found to be exempt from the FLSA, Plaintiffs, on behalf of themselves and the NCWHA Class, seek unpaid minimum wages; liquidated damages in an additional amount equal to the unpaid minimum wages; pre- and post-judgment interest; costs of this action; and reasonable attorneys' fees. *See* N.C. Gen. Stat. §§ 95-25.3; 95-25.13; 95-25.22; 24-1.

**FOURTH CAUSE OF ACTION (IN THE ALTERNATIVE)**
**North Carolina Wage and Hour Act – Unpaid Overtime**
**(On Behalf of Plaintiffs and the NCWHA Class Against All Defendants)**

553. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

554. Alternatively, if Plaintiffs and the NCWHA Class members are found to be exempt from the FLSA, the foregoing conduct, as alleged, violates the NCWHA.

555. At all relevant times, Defendants have been, and continue to be, "employers" that jointly employ individuals within the meaning of the NCWHA.

556. At all relevant times, Defendants have employed, and continue to employ, "employees," including Plaintiffs and NCWHA Class members, within the meaning of the NCWHA.

557. At all relevant times, Defendants have had a policy and practice of failing and refusing to pay overtime wages to Plaintiffs and the NCWHA Class for their hours worked in excess of 40 hours per week, in violation of the NCWHA.

558. In the event Plaintiffs and the NCWHA Class are found to be exempt from the FLSA, Plaintiffs, on behalf of themselves and the NCWHA Class, seek unpaid overtime wages at a rate not less than one and one-half times the regular rate of pay for work performed in excess of 40 hours in a workweek; liquidated damages in an additional amount equal to the unpaid overtime wages; pre- and post-judgment interest; costs of this action; and reasonable attorneys' fees. *See* N.C. Gen. Stat. §§ 95-25.4; 95-25.13; 95-25.22; 24-1.

## FIFTH CAUSE OF ACTION
### North Carolina Wage and Hour Act – Wage Payment
### (On Behalf of Plaintiffs and the NCWHA Class Against All Defendants)

559. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

560. The foregoing conduct, as alleged, violates the NCWHA.

561. At all relevant times, Defendants have been, and continue to be, "employers" that jointly employ individuals within the meaning of the NCWHA.

562. At all relevant times, Defendants have employed, and continue to employ, "employees," including Plaintiffs and NCWHA Class members, within the meaning of the NCWHA.

563.    At all relevant times, Defendants have had a policy and practice of failing and refusing to pay wages earned and due to Plaintiffs and the NCWHA Class, in violation of the NCWHA.

564.    As a result of Defendants' failure to pay wages earned and due, and their decision to withhold wages earned and due to Plaintiffs and the NCWHA Class, Defendants have violated, and continue to violate, the NCWHA.

565.    Plaintiffs, on behalf of themselves and the NCWHA Class, seek damages in the amount of the respective unpaid wages earned and due; liquidated damages in an additional amount equal to the unpaid wages; pre- and post-judgment interest; costs of this action; and reasonable attorneys' fees.  *See* N.C. Gen. Stat. §§ 95-25.6; 95-25.8; 95-25.13; 95-25.22; 24-1.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Unjust Enrichment Class Against All Defendants)

566.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

567.    By the aforementioned conduct, Defendants were unjustly enriched.

568.    By retaining payments from the Contracting Companies for hours worked by Plaintiffs and the Unjust Enrichment Class and failing to pay Plaintiffs and the Unjust Enrichment Class for their hours worked, the RCC Defendants consciously accepted and retained a benefit at the expense of Plaintiffs and the Unjust Enrichment Class.  The RCC Defendants were also unjustly enriched by directly receiving the benefit of Plaintiffs' and the Unjust Enrichment Class's labor without compensating Plaintiffs and the Unjust Enrichment Class for their labor.

83

569. By failing to pay for the full value of the labor of Plaintiffs and the Unjust Enrichment Class, the Contracting Companies consciously accepted and retained a benefit at the expense of Plaintiffs and the Unjust Enrichment Class.

570. Plaintiffs and the Unjust Enrichment Class did not confer the benefit of their labor on Defendants officiously or gratuitously.

571. It would be unfair for Defendants to retain the benefits of Plaintiffs' and the Unjust Enrichment Class's labor without Plaintiffs and the Unjust Enrichment Class being compensated.

572. Plaintiffs and Unjust Enrichment Class are entitled to recover from Defendants all amounts that Defendants have unjustly obtained.

## SEVENTH CAUSE OF ACTION
### Unfair or Deceptive Trade Practice
### (On Behalf of Plaintiffs and the UDTPA Class Against the RCC Defendants)

573. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

574. At all relevant times, the RCC Defendants had a policy or practice of promising rehabilitation services to Plaintiffs and the UDTPA Class and instead subjecting them to abusive and non-therapeutic treatment, including requiring them to work without pay under substandard living conditions.

575. By marketing their services to the public through referrals from licensed substance use rehabilitation providers and judicial and probation personnel, the RCC Defendants' representations and promises regarding its provision of rehabilitation recovery services were and are likely to deceive the average consumer seeking support for substance abuse recovery.

576. The RCC Defendants' policy or practice of requiring Plaintiffs and the UDTPA Class to work without pay under abusive and non-therapeutic conditions, instead of providing promised rehabilitation services, was and is immoral, unethical, oppressive, deceptive, injurious to customers for rehabilitation services, and offensive to public policy.

577. The foregoing conduct – unfairly and deceptively marketing and promising rehabilitation services throughout the state of North Carolina to Plaintiffs and the UDTPA Class, and then requiring residents to perform arduous work without compensation – constitutes an activity "in or affecting commerce" within the meaning of the UDTPA.

578. As a result of the reliance of Plaintiffs and the UDTPA Class on the RCC Defendants' deceptive and unfair marketing and promises of alleged "rehabilitation services," Plaintiffs and the UDTPA Class suffered damages, including emotional distress and unpaid wages.

579. Plaintiffs and the UDTPA Class are entitled to recover all damages resulting from the RCC Defendants' unfair and deceptive conduct, as well as treble damages under N.C. Gen. Stat. § 75-16.

580. The foregoing conduct in violation of N.C. Gen. Stat. § 75-1.1 was willful, warranting an award of reasonable attorneys' fees to Plaintiffs and the UDTPA Class. N.C. Gen. Stat. § 75-16.1.

### EIGHTH CAUSE OF ACTION
### Conversion
### (On Behalf of Plaintiffs and the Conversion Class Against the RCC Defendants)

581. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

582. The RCC Defendants' retention and withholding of payments received from the Contracting Companies for hours worked by Plaintiffs and the Conversion Class constitutes a conversion, as this was an unauthorized assumption and exercise of the right of ownership over the property belonging to Plaintiffs and the Conversion Class, to the exclusion of the ownership rights of Plaintiffs and the Conversion Class.

583. Plaintiffs and the Conversion Class are entitled to recover the fair market value of the converted payments from the RCC Defendants for their hours worked at the time of the conversion, plus interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, pray for the following relief:

A. That, at the earliest possible time, Plaintiffs be allowed to give notice of this collective action, or that the Court issue such notice, to the members of the FLSA Collective (as defined above). Such notice shall inform the FLSA Collective members that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit, among other things;

B. Unpaid minimum wages and unpaid overtime premium pay at a rate not less than one and one-half times the regularly rate of pay for work performed in excess of 40 hours in a workweek, and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

C. Unpaid wages, including unpaid minimum wages and unpaid overtime premium pay at a rate not less than one and one-half times the regularly rate of pay for work performed in excess of 40 hours in a workweek, and an additional and equal amount as liquidated damages pursuant to the NCWHA;

D.      Compensatory damages pursuant to Plaintiffs' common law claim of Unjust

Enrichment;

E.      Treble damages pursuant to the UDTPA;

F.      Compensatory damages pursuant to Plaintiffs' common law claim of Conversion;

G.      Pre-judgment interest and post-judgment interest as provided by federal law;

H.      Pre-judgment and post-judgment interest as provided by North Carolina law,

including interest on all unpaid wages at the statutory rate of 8% per year;

I.      Appropriate equitable and injunctive relief, including but not necessarily limited

to an order enjoining Defendants from continuing their unlawful practices and/or a declaration

that Defendants' acts violate the law;

J.      Certification of the NCWHA Class; the Unjust Enrichment Class; the UDTPA

Class; and the Conversion Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

K.      Designation of Plaintiffs as Class Representatives and Plaintiffs' counsel of

record as Class Counsel;

L.      A reasonable incentive award for Plaintiffs to compensate them for the time and

effort they have spent and will spend protecting the interests of other Recovery Connections

residents, and for the risks they took in doing so;

M.      Reasonable attorneys' fees and costs of the action; and

N.      Such other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


This the 27th day of September, 2018.

Respectfully submitted,

**PATTERSON HARKAVY LLP**

<u>/s/ Narendra K. Ghosh</u>
Narendra K. Ghosh
NC Bar # 37649
nghosh@pathlaw.com
Paul E. Smith
NC Bar # 45014
psmith@pathlaw.com
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Phone: (919) 942-5200
Fax: (866) 397-8671

**NORTH CAROLINA JUSTICE CENTER**
Clermont F. Ripley
NC Bar # 36761
clermont@ncjustice.org
Carol L. Brooke
NC Bar # 29126
carol@ncjustice.org
224 S. Dawson St.
Raleigh, NC 27601
Telephone: (919) 856-2154
Fax: (919) 856-2175

**OUTTEN & GOLDEN LLP**
Melissa L. Stewart
N.Y. Atty. No. 4827747
(*pro hac vice* motion forthcoming)
mstewart@outtengolden.com
Jalise Burt
N.Y. Atty. No. 5314414
(*pro hac vice* motion forthcoming)
jburt@outtengolden.com
685 Third Ave., 25th floor
New York, New York 10017
Telephone: (212) 245-1000
Fax:   (646) 509-2060

*Attorneys for Plaintiffs and the Putative Classes and Collective*